**BRODERICK, Collector of Internal Revenue, v. NEALE.**

**No. 4516.**

United States Court of Appeals
Tenth Circuit.

Jan. 2, 1953.

Louise Foster, Sp. Asst. to the Atty. Gen. (Charles S. Lyon, Acting Asst. Atty. Gen., Ellis N. Slack and Melva M. Graney, Sp. Assts. to the Atty. Gen., Eugene W. Davis, U. S. Atty., Topeka, Kan., and V. J. Bowersock, Asst. U. S. Atty., Columbus, Kan., were with her on the brief), for appellant.

Willard N. Van Slyck, Jr., Topeka, Kan. (Clayton E. Kline and Doran, Kline, Cosgrove, Jeffrey & Russell, Topeka, Kan., were with him on the brief), for appellee.

Before PHILLIPS, Chief Judge, and MURRAH and PICKETT, Circuit Judges.

PHILLIPS, Chief Judge.

Dory J. Neale[1] brought this action on claims for refund of income taxes for the years 1945, 1946, and 1947. From that part of the judgment awarding a refund of taxes for the year 1945, Broderick, Collector, has appealed.

The question presented is whether a contract relating to patent rights executed August 6, 1945, and effective September 1, 1944, was a license and the income derived thereunder royalties, and, therefore, ordinary income, or whether it constituted an assignment of such patent rights so that such income received thereunder was a part of the purchase price of such patent rights, and, therefore, a long-term capital gain.

Neale was employed by the Southwestern Bell Telephone Company from 1926 until October, 1945, in outside telephone construction and maintenance work. In 1937 he commenced development work on certain machines and accessory equipment for use in outside telephone construction work. He did such work during his spare time, evenings, Saturdays and Sundays, in a home work shop in his garage at Topeka, Kansas. He developed two devices, known as Model A and Model C spinners, and certain accessory devices to be used with such spinners. The spinners were machines designed to wrap a spiral of wire around an aerial telephone cable and its steel supporting wire. He also developed a Model B spinner and a Model D spinner. He completed a working model of the Model A spinner and reduced it to actual practice in August, 1938. He completed a working model of the Model C spinner and reduced it to actual practice in 1938. He completed a working model of the Model B spinner

---

1. Hereinafter referred to as Neale.

and reduced it to actual practice in January, 1939. He completed a working model of the Model D spinner and reduced it to actual practice in 1943. He obtained a patent for the Model C spinner, No. 2,-295,749, September 15, 1942; for the Model A spinner, No. 2,300,035, October 27, 1942; for the Model B spinner, No. 2,344,051, March 14, 1944, and for the Model D spinner, No. 2,479,635, August 23, 1949. He also obtained patents in the period between March 14, 1944, and December 5, 1950, for four of the accessory devices. Fourteen of the accessory devices developed by Neale were not protected by patent.

The Model A spinner was operated by a man sitting in and propelling a cable car. The Model C spinner was operated by being pulled with a rope attached to a truck.

In October, 1945, Neale became associated with the Lawlor-Neale Construction Company, which was engaged in the construction of telephone lines. In August, 1946, he severed his connection with the Lawlor-Neale Company and thereafter engaged in the construction of outside telephone facilities as the sole proprietor of the Neale Construction Company. During the four years immediately following August, 1946, he engaged in the construction of a telephone plant at Minot, North Dakota.

The Neale Construction Company was incorporated in 1947 and Neale became its president. He devoted his full time to that company.

In 1940, Neale's wife, B. Ellen Neale, commenced the manufacture of the cable spinners under an oral contract with Neale. She did business under the name of the Neale Manufacturing Company. In 1941 she formed a partnership with W. O. Myers and the partnership continued such manufacturing business. In 1942 or 1943, the name of the partnership was changed to Cable Spinning Equipment Company.[2] The record does not disclose the terms of the oral contracts between Neale and the Neale Manufacturing Company and the Equipment Company.

On August 6, 1945, Neale and the Equipment Company executed a contract,[3] effective from September 1, 1944, entitled "License Agreement." The contract recited that Neale had developed numerous articles for telephone, power, and railroad companies' use and that the Equipment Company was desirous of "manufacturing, selling and distributing" such articles. It provided that in consideration of the sum of one dollar and the agreement of the Equipment Company to pay Neale a seven per cent royalty on all articles and products manufactured, sold, or distributed by it, which had been developed by Neale, Neale licensed and empowered the Equipment Company "to manufacture, sell and distribute within or without the United States of America said articles." It further provided that it should "terminate one year from" its date. An earlier agreement in substantially the same terms, except it provided a different rate of royalty, had been executed by Neale and the Equipment Company on September 1, 1944. However, they never acted under such earlier agreement.

The parties continued to act under the terms of the August 6, 1945, contract until December 31, 1945, when the partnership between Myers and B. Ellen Neale was dissolved. Thereafter, B. Ellen Neale continued the business as sole proprietor under the name "Cable Spinning Equipment Company." On February 20, 1946, Neale and the Equipment Company entered into another contract entitled "License Contract." It was substantially in the same terms as the August 6, 1945, contract, except that it provided for a royalty of six per cent, and further provided:

"Said license to run for the life of the patents. This license may be terminated by one (1) year written notice to the either party of their desire to cancel during the life of the patent."

Neale and B. Ellen Neale testified in effect that they intended that the August 6, 1945, contract should continue in effect during the life of the patents and that the licensees should have all the rights under the patents. They further testified that the provision for termination in the August 6, 1945, contract and the provision for can-

2. Hereinafter called the Equipment Company.

3. Hereinafter referred to as the August 6, 1945, contract.

cellation in the February 20, 1946, contract were to protect Neale against nonpayment of royalties. Neale testified, not to statements made by the parties during the negotiations preceding and leading up to the August 6, 1945, contract, but rather to his opinion or conclusion that such negotiations resulted in an understanding that the licensees would have "full control of the patents with the exception that the contract would run for one year period in case that the royalties were not paid it wouldn't run on forever." B. Ellen Neale testified that such negotiations "were in regard to the percentage of royalty to be paid" and that nothing was said about Neale retaining the right to use the patents. However, they did not testify to any antecedent oral negotiations or statements, by which it was expressly or impliedly agreed, that the August 6, 1945, contract should continue during the life of the patents, and it will be observed that such contract expressly provided that it should terminate one year from the date thereof. Moreover, it is significant that when the February 20, 1946, contract was entered into, the royalty provision was changed and the term of the license was changed. The intent and meaning of the August 6, 1945, contract must be determined from the language of the writing, and, if extraneous matter is to be considered, from the objective statements and acts of the parties and not from their subjective intentions, which here were expressed after the contract was executed.[4] It follows, we think, that while the parties operated under the contract executed August 6, 1945, until February 20, 1946, the rights of the licensees thereunder continued at the will of Neale. Hence, we deem it unnecessary to determine whether the trial court erred, as contended by counsel for the Collector, in admitting oral testimony to vary the terms of the August 6, 1945, contract.

Moreover, it will be observed that the August 6, 1945, contract gave the licensees only the right to manufacture, sell, and distribute the patented articles and did not give them the right to use the patented articles.

■ In order to constitute an assignment of patent rights, there must be a transfer of the exclusive right to make, *use*, and vend the invention and any transfer short of that is not an assignment, but is a license under which the title to the patent is retained in the owner. In Waterman v. Mackenzie, 138 U.S. 252, 256, 11 S.Ct. 334, 335, 34 L.Ed. 923, the court said:

"Whether a transfer of a particular right or interest under a patent is an assignment or a license does not depend upon the name by which it calls itself, but upon the legal effect of its provisions. For instance, a grant of an exclusive right to make, use, and vend two patented machines within a certain district is an assignment, and gives the grantee the right to sue in his own name for an infringement within the district, because the right, although limited to making, using, and vending two machines, excludes all other persons, even the patentee, from making, using, or vending like machines within the district. Wilson v. Rousseau, 4 How. 646, 686 [11 L.Ed. 1141]. On the other hand, the grant of an exclusive right under the patent within a certain district, which does not include the right to make, *and the right to use,* and the right to sell, is not a grant of a title in the whole patent-right within the district, and is therefore only a license. Such, for instance, is a grant of 'the full and exclusive right to make and vend' within a certain district, reserving to the grantor the right to make within the district, to be sold out-

4. Williston on Contracts, Rev.Ed., Vol. 1, § 94, Vol. 5, § 1536; Restatement, Contracts, § 20; O'Donnell v. Town of Clinton, 145 Mass. 461, 14 N.E. 747, 751; Hotchkiss v. National City Bank of New York, D.C.S.D.N.Y., 200 F. 287, 293; United States Potash Co. v. McNutt, 10 Cir., 70 F.2d 126, 129;

Porter v. Commercial Casualty Ins. Co., 292 N.Y. 176, 54 N.E.2d 353, 356; Canavan v. College of Osteopathic Physicians and Surgeons, 73 Cal.App.2d 511, 166 P.2d 878, 882. See also dissenting opinion in Motter v. Patterson, 10 Cir., 68 F.2d 252, 258, and cases there cited.

624

side of it. Gayler v. Wilder, above cited ['10 How. 477, 13 L.Ed. 504]. So is a grant of 'the exclusive right to make and use,' but not to sell, patented machines within a certain district. Mitchell v. Hawley, 16 Wall. 544, [21 L.Ed. 322]. So is an instrument granting 'the sole right and privilege of manufacturing and selling' patented articles, and not expressly authorizing their use, because, though this might carry by implication the right to use articles made under the patent by the licensee, it certainly would not authorize him to use such articles made by others. Hayward v. Andrews, 106 U.S. 672, 1 S.Ct. 544 [27 L.Ed. 271]. See, also, Oliver v. Rumford Chemical Works, 109 U.S. 75, 3 S.Ct. 61 [27 L. Ed. 862]." (Italics ours.)

In United States v. General Electric Company, 272 U.S. 476, 489, 47 S.Ct. 192, 196, 71 L.Ed. 362, the court said:

"The owner of a patent may assign it to another and convey, (1) the exclusive right to make, use, and vend the invention throughout the United States; or (2) an undivided part or share of that exclusive right; or (3) the exclusive right under the patent within and through a specific part of the United States. But any assignment or transfer short of one of these is a license giving the licensee no title in the patent * * *."[5]

Here, the record discloses that prior to September 1, 1944, and prior to the formation of the partnership by B. Ellen Neale and W. O. Myers in the summer of 1941, machines, covered by the patents, were constructed by Neale and manufactured by B. Ellen Neale, and clearly Neale retained the right to use any of such machines, even though there was an implied right in the partnership to use the machines manufactured by it.

■ Accordingly, we conclude that the August 6, 1945, contract was a license, and not an assignment, and that the income derived thereunder during the year 1945 was ordinary income.

Our conclusion is also supported by the decision in the recent case of Bloch v. United States, 2 Cir., 200 F.2d 63, where the court held that royalty payments under a contract granting an exclusive license to "make, use, exercise or vend" certain patented devices covered by certain United States Patents and retaining the right of the patentee to terminate the agreement and recapture the patent on default of the licensee, were ordinary income.

The judgment, in so far as it awarded a refund of taxes for the year 1945, is reversed.

---

5. See also Six Wheel Corporation v. Sterling Motor Truck Co., 9 Cir., 50 F.2d 568, 571, 572.