ERNEST E. ROLLMAN AND HILDA S. ROLLMAN, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 51963, 51974, 51975, 51976. Filed December 15, 1955.

[1] Proceedings of the following petitioners are consolidated herewith: Curt E. Kaufman and Louise Kaufman, Husband and Wife, Docket No. 51974; Heinz W. Rollman and Tania Rollman, Husband and Wife, Docket No. 51975; Walter Kaufman and Ellen Kaufman, Husband and Wife, Docket No. 51976.

*David Alter, Esq.*, for the petitioners.
*Hubert E. Kelly, Esq.*, for the respondent.

484

486

488

OPINION.

FISHER, *Judge:* The first issue presented is whether amounts received by The Rollmans in 1947, 1948, and 1949, pursuant to the agreement of December 19, 1940 (set out in our Findings of Fact), are ordinary income or long-term capital gain. Petitioners contend that the payments in question are based on a sale of the Rajeh patent, a capital asset, whereas respondent determined that the payments represent royalties derived from a licensing agreement. The agreement in question grants to Rikol on behalf of The Rollmans "an exclusive license (except for two non-exclusive licenses now outstanding * * *) for the manufacture and sale of shoes" under the Rajeh patent throughout the United States.

Whether the transfer of the patent rights (held for more than 18 months prior to transfer) resulted in capital gain or ordinary income depends on whether the patent was a capital asset in the hands of the transferor, and if so, whether the transfer amounted to a sale or assignment of patent rights as distinguished from a mere license agreement. See *Edward C. Myers*, 6 T. C. 258 (1946); *Parke, Davis & Co.*, 31 B. T. A. 427 (1934). We will assume *arguendo* that the Rajeh patent was a capital asset held by The Rollmans for the length of time required for long-term capital gain treatment, so that the practical problem reduces itself to the question of whether there was a sale or a license.

It is well established that while the name or form of an agreement does not control its nature and legal effect, *A. B. Watson*, 24 B. T. A. 466 (1939), affd. (C. A. 9, 1932) 62 F. 2d 35; *Parke, Davis & Co., supra; Kimble Glass Co.*, 9 T. C. 183 (1947), the agreement must effect a transfer of all of the substantial rights of the patentee under the patent in order to constitute a sale for Federal income tax purposes. The view expressed by the United States Supreme Court in *Waterman* v. *MacKenzie*, 138 U. S. 252 (1891), in respect to the type of transfer which constitutes an assignment or sale as distinguished from a mere license is here controlling. In the *Waterman* case, the Court said:

> Whether a transfer of a particular right or interest under a patent is an assignment or a license does not depend upon the name by which it calls itself, but upon the legal effect of its provisions. For instance, a grant of an exclusive right to make, use and vend two patented machines within a certain district, is an assignment, and gives the grantee the right to sue in his own name for an infringement within the district, because the right, although limited to making, using and vending two machines, excludes all other persons, even the patentee, from making, using or vending like machines within the district. *Wilson* v. *Rousseau*, 4 How. 646, 686. On the other hand, the grant of an exclusive right under the patent within a certain district, which does not include the right to make and the right to use, and the right to sell, is not a grant of a title in the whole patent right within the district, and is therefore only a license. Such, for instance, is a grant of "the full and exclusive right to make and vend" within a certain district, reserving to the grantor the right to make within the district, to be sold outside of it. *Gayler* v. *Wilder*, above cited. So is a grant of "the exclusive right to make and use," but not to sell, patented machines within a certain district. *Mitchell* v. *Hawley*, 16 Wall. 544. So is an instrument granting "the sole right and privilege of manufacturing and selling" patented articles, and not expressly authorizing their use because, though this might carry by implication the right to use articles made under the patent by the licensee, it certainly would not authorize him to use such articles made by others. *Hayward* v. *Andrews*, 106 U. S. 672. See also *Oliver* v. *Rumford Chemical Works*, 109 U. S. 75.

See *Edward C. Myers, supra; Federal Laboratories, Inc.*, 8 T. C. 1150 (1947); *Kimble Glass Co., supra; Cleveland Graphite Bronze Co.*, 10 T. C. 974 (1948), affirmed per curiam (C. A. 6, 1949) 177 F. 2d 200; *Lynne Gregg*, 18 T. C. 291 (1952), affirmed per curiam on the basis of

the Opinion of this Court (C. A. 3, 1953) 203 F. 2d 954. See also *Broderick* v. *Neale*, (C. A. 10, 1953) 201 F. 2d 621. It is necessary, therefore, that the conveyance include the exclusive right to make, use, and vend the patented item throughout the United States (or some part thereof) if the transaction is to be deemed to constitute an assignment or sale. See *United States* v. *General Electric Co.*, 272 U. S. 476 (1928). A conveyance of anything less would not be a sale or assignment but merely a license.

' The agreement here in question conveys exclusively to Rikol only the right to manufacture and sell shoes made by Rikol under the patented process. It prevents Rikol from granting sublicenses except that Rikol shall have the right to grant licenses to other corporations or enterprises directly or indirectly controlled by Leo Weill. It permits Rikol to assign the contract only to a corporation to be formed provided the corporation is directly or indirectly controlled by Leo Weill. It does not allow Rikol to license or permit the use of the patented process by other than enterprises controlled by Weill for the manufacture of shoes to be sold by Rikol or its assignee controlled by Weill. The transfer, therefore, was not a grant of all of the substantial rights of The Rollmans under the Rajeh patent. *Waterman* v. *MacKenzie, supra; Cleveland Graphite Bronze Co., supra; Lynne Gregg, supra.*

Petitioners urge us to find that the parties intended to consummate a sale rather than a license on the basis of testimony of Ernest Rollman to the effect that, during the negotiations, Dayton insisted on a complete transfer of the rights of The Rollmans under the Rajeh patent in order to safeguard its proposed investment in a rubber plant. We can readily visualize such an approach by Dayton, but the contract as ultimately written is inconsistent with this objective in the material respects which we have already set forth, and we can only assume that Dayton was finally satisfied that its own interests were sufficiently protected by the agreement which was accepted and executed by the parties. Upon the record, we see no reason to vary its clear and unambiguous terms.

The case before us is distinguishable from *Allen* v. *Werner*, (C. A. 5, 1951) 190 F. 2d 840, relied on by petitioners. There the precise question presented to the Court of Appeals was whether the trial court erred in admitting and considering parol evidence in the construction of an agreement relative to the manufacture and sale of hydraulic lifting jacks under a patent. The tax question before the lower court was whether amounts received by the grantor were ordinary income or long-term capital gain from the sale of a capital asset. The dispute of the parties centered on whether the agreement conveyed the right of use in addition to the exclusive right to manufacture and sale. There the initial grant in the contract had not included

the right to use, but in another portion of the document it was expressly stated that the licensee contemplated manufacture, *use*, and sale. In such circumstances it was evident, and the lower court so held, that the terms and provisions of the written agreement were ambiguous, and that parol evidence might therefore properly be admitted to resolve the ambiguity.

Petitioner argues further on the basis of the lower court's Conclusions of Law in the *Werner* case that as a consequence of the nature of the patented subject matter, the retention of the right of use would be inconsequential, and that for tax purposes it would be proper to disregard that factor in determining whether the patentee had effected a sale rather than a license. In essence, petitioner contends that in the case of a patent of a process for the manufacture of an article for sale, failure to grant the transferee the right to permit a third party to use the process in manufacturing the article for sale by the transferee does not result in a transfer of less than all of the substantial rights under the patent. We note that the Court of Appeals did not consider this issue in the *Werner* case. In the case before us we are satisfied that the right to permit use of the patented process by a third party for its own or the transferee's benefit was a substantial right and that Rikol and its assignee controlled by Weill was not granted that right by the terms of the contract. We add that a careful examination of the facts of the *Waterman* case and of the cases decided by this Court on the authority of *Waterman* discloses that, in the main, patents of the type here under consideration were involved, and the factor of "use" was deemed substantial. We find no reason to hold otherwise in the instant case.

Other cases relied upon by petitioners are distinguishable on their facts.

In *Commissioner* v. *Celanese Corp.*, (C. A., D. C., 1944) 140 F. 2d 339, and *Commissioner* v. *Hopkinson*, (C. A. 2, 1942) 126 F. 2d 406, the owners of the patent rights executed agreements which contained language showing a clear and unmistakable intent to part with the whole of the patents, and in addition executed assignments of each of the patents which were recorded in the United States Patent Office. In *Celanese* the agreement stated that the vendors "assign and make over * * * the said processes and the full benefit thereof." The court concluded that the parties intended to effect a purchase and sale of the patents and not merely a royalty use when they used such words of outright conveyance and sale. Similarly, in *Hopkinson* the contract stated that the seller "has granted, bargained, sold, conveyed, transferred, assigned, set over and delivered" its right in certain patents. The court there concluded that the parties' intention as shown by the language in the contract was to have the "seller" sell

and the "purchaser" buy the property. See also *General Aniline & Film Corp.* v. *Commissioner*, (C. A. 2, 1944) 139 F. 2d 759.

In *Kronner* v. *United States*, (Ct. Cl., 1953) 110 F. Supp. 730, the agreement, there designated as a "license," contained clear language of sale, conveying "the sole and exclusive right to manufacture, vend, sell, license, or relicense, or in anywise use * * * the invention * * * for the life of the patent." The court, despite defendant's contention, believed that the intention of the parties was best evidenced by the words used in the contract and concluded that the patentee had parted with the whole of his patent rights.

With respect to *Parke, Davis & Co., supra*, there was a grant of an undivided share of the exclusive right to make and use the invention covered by the patent. We deem it unnecessary to discuss the case further than to point out that the contract granted to the transferee, in substance, the right which the agreement in the instant case fails to cover, namely, "the exclusive right, license and privilege to manufacture and have manufactured for its exclusive use * * *."

Since we have held that the transfer in the instant case was not a grant of all of the substantial rights of The Rollmans, it is unnecessary for us to consider respondent's other contention that the patent here in question was not a capital asset in the hands of The Rollmans, having been held primarily for sale to customers in the ordinary course of business.

The remaining question concerns the amount, if any, to be allowed as a deduction for depreciation on two patents known as Paraflex and Snow Boot used by petitioners in their business, and, in view of our holding on the first issue, a like question with respect to the Rajeh patent held by petitioners for the production of income. See sec. 23(1), I. R. C. 1939, and Regs. 111, sec. 29.23(1)–3.

During each of the years involved The Rollmans deducted on its partnership returns, $1,765 in respect to Paraflex and $882.50 in respect to Snow Boot. These amounts claimed for depreciation were based on a useful life of 17 years of each patent and a cost of $30,000 for Paraflex and $15,000 for Snow Boot. No deduction has heretofore been taken on the Rajeh patent. Petitioners here claim depreciation allowances in the amounts above stated in respect to Paraflex and Snow Boot and an additional allowance for the years involved in respect to Rajeh on the basis of a cost of $25,000 to $50,000. Respondent's main contention is that petitioners have failed to prove their cost basis for depreciation on the three patents, and therefore, that the disallowance of the amounts claimed for depreciation should be sustained for lack of substantiation by petitioners.

Petitioners were unable to produce their books and records reflecting the various elements of cost properly attributable to the development

of the patents here in question. Petitioners left their books and records in Belgium when they were forced to flee that country at the time of the German invasion in 1940. Admittedly they have made little effort to locate these books and records. Nevertheless, under the circumstances of this case, we think that petitioners have fairly assumed on the basis of the response to their limited inquiries that the books and records of the Belgian partnership were in all probability destroyed by the German occupation authorities. We are therefore faced with a situation where it is obvious that petitioners are entitled to an allowance for depreciation, but are unable to substantiate their cost basis in the depreciable assets by the books and records they kept reflecting the development costs of the patents in question. Such a situation is not an unusual consequence of war and we think it does not pose an unsurmountable obstacle to a reasonable allowance. We have before us the testimony of petitioners who were familiar with the circumstances of and the cost of development at the time. Obviously, precise contemporaneous records of the basis of the assets would, if available, represent the sound foundation to be desired, but, despite the passage of substantial time, we think the evidence is sufficient to warrant exercise of our discretion under the rule of *Cohan* v. *Commissioner*, (C. A. 2, 1930) 39 F. 2d 540.

There are involved here two elements of cost. First, there is the cost of certain hydraulic presses used by The Rollmans solely in connection with the development of the three patents here in question. These hydraulic presses, four in number, were purchased at various times during 1936 and were used from the time of purchase through May 10, 1940, when the Germans invaded Belgium. As a consequence of the German occupation, The Rollmans have never been able to recover the machines or any part of their value. Each of the presses purchased in 1936 had a useful life of approximately 20 years. The cost of the first press constructed for The Rollmans was 500,000 Belgian francs, which converted at the then existing rate of exchange was $16,667. Each of the other presses cost The Rollmans 60,000 Belgium francs or $2,000, as conceded by petitioners. The presses were used for approximately 4 years in the development of the patented processes here in issue and subject to depreciation. Therefore, one-fifth of the useful life of these presses entered into the development of these processes and one-fifth of the cost of the presses should be attributable to the development of these processes as a basis for depreciation. Petitioner Ernest Rollman estimates that approximately one-third of the cost of the presses attributable to the cost of patents is attributable to each of the processes developed and we have so found in accordance with his testimony. See *Claude Neon Lights, Inc.*, 35 B. T. A. 424, 442 (1937) ; *John F. Canning*, 29 B. T. A. 99 (1933) ; *Buffalo Forge Co.*, 5 B. T. A. 947 (1926).

In addition to these amounts, petitioners contend that The Rollmans incurred a further expense in connection with the acquisition of Paraflex and Rajeh, the first of which was owned completely by Szerenyi as inventor, and the second of which was owned equally by Szerenyi and Hans Rollman as co-inventors. Respondent, on the other hand, contends that any amounts paid to Szerenyi by The Rollmans were in reality his share of partnership earnings or of the earnings from a joint venture, entered into between Szerenyi and The Rollmans to exploit the Paraflex and Rajeh patents, and that such amounts were not payments by The Rollmans partnership to Szerenyi on account of his interest in these two processes which The Rollmans wished to acquire. (The controlling agreement in pertinent part is set forth in the Findings of Fact.) The respondent points out in support of his contention that Szerenyi's association with the partnership was necessary for the success of the partnership business, mainly because the partnership did not otherwise have access to any great inventive ability, that Szerenyi's participation in the profits of The Rollmans was at least as much and probably greater than that of a junior partner, and that under Articles 20–23 of the agreement, provision was made for partition of the assets in case of termination of the agreement. We think, however, that the substance of these various provisions of the agreement and other circumstances pointed to by respondent are equally consistent with the petitioners' view, and that the agreement, in accordance with its terms, was one for the transfer of patent rights and for the rendering of consulting services, essentially as an employee. It must be kept in mind that individuals may arrange their business relations freely and in any manner which best suits their needs, and that no other quality than that intended should be attributed to such arrangement in the absence of some compelling consideration to prevent tax avoidance and to preserve the substance of a transaction over its form.

Whether or not parties to an agreement have undertaken thereby to engage in a joint venture is a question of their intention in entering into the agreement, to be gleaned from the terms of the agreement and the conduct of the parties in carrying out its provisions. *Wm. J. Lemp Brewing Co.*, 18 T. C. 586 (1952). (This is the only real issue raised by respondent, we think, since it is quite clear from the terms of the agreement that there was no formal taking in of Szerenyi as another partner in The Rollmans, which business consisted of very much more than the exploitation of the Paraflex and Rajeh patents.) While the agreement between Szerenyi and The Rollmans is intricate and complex, we believe that it was not intended to and did not establish between them a working arrangement in the nature of a joint venture. The terms of the agreement are drawn in language

of sale and professional service with respect to the transfer of Szerenyi's patent rights and for his rendering of consulting services. The basing of Szerenyi's compensation on the net yields from certain exploitation of the Paraflex and Rajeh patents and from the other operations of The Rollmans, which doubtless included possible use of these patents in connection with the technical consulting function, appears to be an appropriate means of realizing upon the value of the patent rights. An accounting likewise appears to be a proper means to insure full payment, rather than an indication of control over the venture by Szerenyi, as suggested by the respondent. Further, the coincidence of the amount of the payments (which must have accorded with the parties' estimate of the value of the patent rights transferred) with the share of the profits of The Rollmans to which a junior partner would be entitled to receive does not appear to us to be significant in the light of the other circumstances involved in this case. It should be noted that future improvements and other inventions of Szerenyi became by the terms of the agreement the property of The Rollmans alone without further compensation to Szerenyi. With respect to the provisions for retransfer of certain of the patents or patent rights upon termination of the agreement under specified circumstances, we need only point out that at least with respect to the patents here in issue The Rollmans have permanently acquired them as their own under the agreement, and we think that such acquisition is consistent with the view that it is a result of the purchase of those patents and not the result of a subsequent apportioning of Szerenyi's capital contribution to a joint venture between himself and The Rollmans, as contended for by respondent. We might add that the provisions for reconveying to Szerenyi certain patents or patent rights upon termination of the particular agreement here in question might well have been intended as a means of insuring the further extension of the basic agreement for compensating Szerenyi for the transfer. The various circumstances pointed to by respondent, whether considered separately or as a whole, seem to us largely equivocal and not sufficient to counterbalance the other language of the agreement, or the actions of the parties under the agreement.

In the light of the foregoing, we hold that the payments made to Szerenyi for his interest in these two patents were made under a contract between The Rollmans and Szerenyi concerning the purchase of these interests and compensation for his activity as an advisory consultant to The Rollmans.

Respondent argues further that whatever payments may have been made to Szerenyi under the agreement were made for the several Paraflex and Rajeh patents (the two processes having been patented in several countries) so transferred, and therefore, that any amount

to be capitalized should be apportioned among the various countries in which patents for these processes were issued. Respondent urges that if such allocation is not possible upon the record, no allowance should be made. Respondent does not make a like argument in respect to the actual development costs for creation of the process in the first instance and we need not take up the latter point.

The record is not as clear as it might be with respect to the basis of the patents for depreciation purposes. Because of this, we have, in our ultimate Findings of Fact (and see further discussion, *infra*), resolved any doubts in this connection against petitioners. Since The Rollmans reported income from all sources, including foreign income, we think the issue suggested by respondent has little practical significance in the instant case, and does not warrant any further reduction of what we regard as a minimum basis on the whole record. It may be added that respondent has limited his argument to the issue of basis, and does not question the rate.

Petitioner Ernest Rollman testified variously that payments to Szerenyi under the contract were from $20,000 to $35,000 (converted from Belgian exchange) for his interest in Paraflex for the 4-year period, 1936 through May 1940, and half as much for his interest in Rajeh. Although the testimony is not precise, we are satisfied that substantial amounts were paid to Szerenyi for his interests in Paraflex and Rajeh. Having in mind the principles of *Cohan* v. *Commissioner*, *supra*, we hold that $20,000 was paid to Szerenyi for his interest in Paraflex and $10,000 for his interest in Rajeh. This determination is reflected in our Findings of Fact.

No evidence was introduced by petitioners to support other costs for steel molds and sundry tools used in the development of any of the three processes. We therefore sustain the respondent in disallowing any depreciation in relation to such items.

In the light of the foregoing, we hold that petitioners' bases for depreciation (over a useful life of 17 years) during the years in question are as set out below:

|  | Machines | Szerenyi Payments | Total |
|---|---|---|---|
| Rajeh | $1, 512 | $10, 000 | $11, 512 |
| Paraflex | 1, 512 | 20, 000 | 21, 512 |

In respect to Snow Boot, no basis remains for depreciation. Petitioners have previously deducted $2,647 in depreciation on Snow Boot. We could here find a basis not in excess of $1,512. Petitioners have, therefore, been allowed to recover an amount in excess of the basis which they have here established and are entitled to recover no more. See sec. 113 (b) (1) (B).

*Decisions will be entered under Rule 50.*