DAIRY QUEEN OF OKLAHOMA, INC., DISSOLVED, L. E. COPELIN, TRUSTEE, L. H. NEHRING, TRUSTEE, PRISCILLA NEHRING, TRUSTEE, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 48220, 48221, 48222, 48237. Filed April 11, 1956.

[1] Transferee proceedings of the following petitioners are consolidated herewith: L. H. Nehring, Alleged Transferee, Docket No. 48221; Priscilla Nehring, Alleged Transferee, Docket No. 48222; and L. E. Copelin, Alleged Transferee, Docket No. 48237.

*Robert Ash, Esq.*, and *Charles H. Burton, Esq.*, for the petitioners.
*Frank C. Allen, Esq.*, for the respondent.

OPINION.

Arundell, *Judge:* █ The main question is whether the amounts (both the lump-sum and gallonage payments) petitioner corporation received during the years 1948 and 1949 from the second parties in the 36 franchise agreements represented proceeds from the sales of capital assets and are taxable as long-term capital gain under section 117 [3] of the Internal Revenue Code of 1939, or whether such amounts were royalties taxable as ordinary income.

In its returns petitioner corporation reported the lump-sum payments as capital gain and the gallonage payments as royalties. It now contends, however, that both kinds of payments are part of the consideration for the sale of subfranchise rights and should be taxed as long-term capital gain under section 117. The respondent contends that the said franchise agreements entered into during the taxable

---

[3] SEC. 117. CAPITAL GAINS AND LOSSES.

(a) DEFINITIONS.—As used in this chapter—

(1) CAPITAL ASSETS.—The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1) * * *

*     *     *     *     *     *     *

(4) LONG-TERM CAPITAL GAIN.—The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing net income ;

years 1948 and 1949 were mere licensing agreements and that both kinds of payments were royalties taxable as ordinary income.

In the alternative, the respondent contends that if it be held that the franchise agreements in question could be regarded as a "sale or exchange" within section 117 (a) (4), *supra*, such sale or exchange was not one of "capital assets" as that term is defined in subsection (a) of section 117 and, further, that for the year 1948 it has not been shown that the assets claimed to have been sold were "held for more than 6 months" as is required under section 117 (a) (4). In this connection, see *Kronner* v. *United States*, 126 Ct. Cl. 156, 110 F. Supp. 730, wherein the court said:

To avail themselves of the benefits of section 117, the burden is upon the taxpayers to establish (1) that the property in question is a "capital asset" as defined in section 117, (2) that there has been a "sale or exchange" of that property, and (3) that it has been held for more than six months prior to the "sale or exchange."

We are of the opinion that the 36 franchise agreements here in question did not constitute sales or exchanges but were mere licensing agreements, as respondent contends. In so holding, it will not be necessary to consider the alternative contentions argued by the respondent.

In determining whether or not the transactions here involved constitute sales or licensing agreements, we recognize that the terms used in the agreements such as "LICENSEE" and "continuing royalty" are not controlling or conclusive. *Waterman* v. *Mackenzie*, 138 U. S. 252; *Parke, Davis & Co.*, 31 B. T. A. 427; *Edward C. Myers*, 6 T. C. 258.

We have set out in our findings practically an entire "DAIRY QUEEN FRANCHISE AGREEMENT" which the parties have stipulated represented a sample of the 36 written agreements entered into by petitioner corporation during the taxable years. We think there are too many restrictions in these agreements to justify a holding or a finding that any sale or exchange took place. The agreements have some of the elements of a sale as for instance where the first party "has agreed to grant to the LICENSEE an exclusive territory within the State of Oklahoma." But this was "upon the terms and conditions as hereinafter set forth." These terms and conditions were such that other parts of the agreements, as for instance where the "COMPANY shall furnish for the use of the LICENSEE" the necessary freezers, which "freezers shall be and remain the property of COMPANY," bespeak of a licensing arrangement rather than a sale. We do not, however, think it would be proper to attempt, as petitioner corporation did in filing its returns, to split the consideration as being partly for sales and partly for licensing. We think we are compelled to treat all the consideration as being for a single "bundle" of rights and privileges

for the reason that the territory, trade name, freezers, and formula all are necessary for the successful operation of a Dairy Queen store and one would be valueless without the others. When looked upon in this manner, we cannot say that petitioner corporation "sold" this bundle of rights to the second parties. Specifically, the freezers were to "remain the property" of the first party. The second parties could only procure its mix "from a source of supply which is approved by" the first party. The first party and the patent owner had the right to audit the records of the second party "to determine if royalties have been correctly paid." The second parties were compelled at all times to "maintain the standards and quality set up by" the first party "with respect to cones, cups, flavoring, and all miscellaneous supplies." The second parties could sell no other products than Dairy Queen, and in the event of termination of the agreement could not engage in the preparation, sale, or distribution of a similar product for a period of 5 years. If the second parties violated "any of the material obligations" of the agreement, the first party had the right to enter and remove the freezers free and clear of any damages. We hold, therefore, that the 36 franchise agreements were licensing agreements and that all of the consideration received by petitioner corporation (both lump-sum and gallonage payments) represented royalties taxable as ordinary income. *Federal Laboratories, Inc.*, 8 T. C. 1150; *Cleveland Graphite Bronze Co.*, 10 T. C. 974, affd. 177 F. 2d 200; *John Randolph Hopkins*, 15 T. C. 160; *Broderick* v. *Neale*, 201 F. 2d 621; *Lynne Gregg*, 18 T. C. 291, affd. 203 F. 2d 954; *Ernest E. Rollman*, 25 T. C. 481. Cf. *Kimble Glass Co.*, 9 T. C. 183.

■ In its return for 1948 petitioner corporation, in computing the gain on the $57,056.45 of lump-sum payments received in 1948, excluded from the gross sales price the entire amount of $18,314.30 which it had assumed at the time of incorporation as representing that part of the $23,364 Copelin had agreed to pay the McCulloughs. See footnote 2 above.

Petitioner corporation now concedes that it was in error in excluding from the gross sales price the entire amount of $18,314.30 in 1948 but contends that some reasonable allocation of its basis should be made for the subfranchises which it contends it sold in 1948 and 1949. The respondent contends that not only were there no sales of subfranchises in either 1948 or 1949 but that petitioner corporation is not entitled to deduct any part of the $18,314.30 in either year in any event.

We held under the first issue that the 36 franchise agreements were not sales or exchanges. Therefore, there would be no occasion to compute any "gain" by excluding or deducting from the selling price a portion of the basis of the property alleged to have been sold. Peti-

tioner corporation does not contend nor has it shown that some part or all of the $18,314.30 is deductible from gross income on other grounds. We, therefore, sustain the respondent's determination.

■ The thi..d issue is whether petitioner corporation was a "personal holding company" for the year 1949 within the meaning of that term and the term "personal holding company income" as defined in sections 501 [4] and 502,[5] respectively, of the 1939 Code.

Any corporation is a "personal holding company" if it meets the two requirements of section 501. The requirement as to stock ownership is not in dispute. All the stock during 1949 was owned by three stockholders. In order to meet the gross income requirement under section 501 (a) (1), at least 80 per cent of its gross income must be "personal holding company income as defined in section 502." (Footnote 5, *supra*.) The gross income of petitioner corporation for the year 1949 consisted of the following amounts:

| | | |
|---|---|---|
| 1. Gross profit from sales | $18,648.58 | (as stipulated) |
| 2. Long-term capital gain (auto) | 11.23 | (defic. notice) |
| 3. Lump-sum payments from licensees | 62,916.89 | |
| 4. Gallonage payments from licensees | 74,575.70 | |
| Total gross income | $156,152.20 | |

Under the first issue we held that items 3 and 4, which together amount to more than 80 per cent of the total gross income, were "royalties" taxable as ordinary income. This, of course, brings petitioner within the gross income requirement of section 501 (a) (1). Petitioner makes alternative contentions that item 3 should be regarded as "advance rental" for the use of the machines and item 4 should be reduced to $19,021.29 by reason of the deduction taken in the return and allowed of $55,554.41 of royalties which it was required to pay to prior owners or assignors. There is no merit to the second part of that argument because the test in section 501 (a) (1) is based upon gross income which is before any deduction. The first

[4] SEC. 501. DEFINITION OF PERSONAL HOLDING COMPANY.

(a) GENERAL RULE.—For the purposes of this subchapter and chapter 1, the term "personal holding company" means any corporation if—

(1) GROSS INCOME REQUIREMENT.—At least 80 per centum of its gross income for the taxable year is personal holding company income as defined in section 502 ; * * *

(2) STOCK OWNERSHIP REQUIREMENT.—At any time during the last half of the taxable year more than 50 per centum in value of its outstanding stock is owned, directly or indirectly, by or for not more than five individuals.

[5] SEC. 502. PERSONAL HOLDING COMPANY INCOME.

For the purposes of this subchapter the term "personal holding company income" means the portion of the gross income which consists of :

(a) Dividends, interest (other than interest constituting rent as defined in subsection (g)), royalties (other than mineral, oil, or gas royalties), annuities.

\* \* \* \* \* \* \*

(g) RENTS.—Rents, unless constituting 50 per centum or more of the gross income. For the purposes of this subsection the term "rents" means compensation, however designated, for the use of, or right to use, property * * *

part of the argument then becomes of no consequence either because even though item 3 were to be regarded in whole or in part as "advance rental" for the use of the machines it would not amount to 50 per cent of the gross income and, therefore, would not be eliminated from personal holding company income. Sec. 502 (g). The petitioner has not shown that less than 80 per cent of its gross income was personal holding company income as defined in section 502. *Hugh Smith, Inc.*, 8 T. C. 660, affd. 173 F. 2d 224, certiorari denied 337 U. S. 918.

■ The parties are in agreement that the individual petitioners are liable as transferees for 'any deficiencies owing by petitioner corporation to the extent of the stipulated value of the corporation's assets received by them upon dissolution. The amount of any deficiencies owing by the corporation will be determined under Rule 50 and the individual petitioners' liability as transferees will be determined accordingly.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*