Dairy Queen of Oklahoma, Inc., Dissolved, L. E. Copelin, Trustee, L. H. Nehring, Trustee, Priscilla Nehring, Trustee, et al. [1] v. Commissioner. Dairy Queen of Oklahoma, Inc. v. Commissioner
Docket Nos. 48220-48222, 48237.
United States Tax Court
T.C. Memo 1959-61; 1959 Tax Ct. Memo LEXIS 183; 18 T.C.M. (CCH) 322; T.C.M. (RIA) 59061; March 31, 1959
*183 Upon remand, held, the 36 territorial franchises which petitioner, Dairy Queen of Oklahoma, Inc., sold in 1948 and 1949 were "capital assets" as that term is defined in section 117(a)(1), I.R.C. of 1939; held, further, the assets sold in 1948 had been held by petitioner for more than 6 months within the provisions of section 117(h), I.R.C. of 1939, and the gains from the sales thereof were long-term capital gains within the meaning of section 117(a)(4), I.R.C. of 1939. Robert Ash, Esq., Munsey Building, Washington, D.C., and Charles H. Burton, Esq., for the petitioners. Frank C. Allen, Esq., and John P. Higgins, Esq., for the respondent. *184 ARUNDELL
Memorandum Findings of Fact and Opinion ARUNDELL, Judge: Our decisions entered August 21, 1956, pursuant to our findings of fact and opinion filed April 11, 1956, (26 T.C. 61) were reversed and remanded by the United States Court of Appeals, Tenth Circuit, on December 3, 1957, (250 F. 2d 503) "for further proceedings in accordance with the views expressed in the opinion of the court." In our report filed April 11, 1956, we held that the 36 agreements in question were licensing agreements rather than sales of property. The Court of Appeals reversed this holding and held that the 36 agreements were sales of property rather than licensing agreements. In its opinion it said: "We conclude that the transactions amounted to a sale * * * and the question remains whether the sales were made in the course of trade or business. The Tax Court did not reach that question, and the case is reversed and remanded for its determination in the first instance." The respondent contends, in the alternative, that if we hold for the petitioners on the remanded question, then it becomes necessary to determine under section 117(h) and 117(a)(4), I.R. *185 C. of 1939, whether the assets sold in 1948 had been held by the petitioner corporation for more than 6 months. The parties have stipulated that in computing the gain from the sales of the 19 territorial franchises in 1948 and the 17 territorial franchises in 1949 the petitioner corporation is entitled to deduct from the selling prices thereof its cost basis of such franchises in the amounts of $7,519.86 for 1948 and $8,290.88 for 1949. Effect will be given to this stipulation under Rule 50. The basic facts are not in dispute and are contained in our report filed April 11, 1956, and succinctly restated [2] by the Court of Appeals as "background" facts. Only those facts which are necessary for a proper understanding of the question remanded and the alternative issue pleaded by respondent need be found. Findings of Fact The supplemental stipulations of facts filed July 30, 1958, and January 23, 1959, are found as stipulated. At sometime during 1946 Copelin associated with him as partners L. H. Nehring and *186 Priscilla Nehring. The Nehrings put up the necessary cash, and profits were to be shared equally between Copelin and the Nehrings, namely, 50 per cent to Copelin, 25 per cent to L. H. Nehring, and 25 per cent to Priscilla. It was the original plan of the partnership to build, own, and operate the stores required to be established in the State of Oklahoma under the terms of the written agreement between Copelin and McCullough. On June 24, 1947, Copelin and the Nehrings entered into an agreement to form a corporation wherein it was agreed that the entire business of the partnership would be transferred to a corporation to be known as Dairy Queen of Oklahoma, Inc., which was to be organized on or about January 1, 1948, and "That as consideration for this property the corporation shall issue $5,000.00 in stock to LaVerne H. Nehring, $5,000.00 in stock to Priscilla Nehring and $10,000.00 in stock to L. E. Copelin." Petitioner corporation was incorporated on January 24, 1948, in accordance with all of the provisions of the agreement of June 24, 1947. Article Three of the articles of incorporation of petitioner corporation, dated January 14, 1948, provides as follows: "The duration *187 of the corporation is: Twenty Years. The purpose or purposes for which the corporation is formed are: to provide, purchase, own, maintain, sell, lease, mortgage, convey, improve and in any ways use and operate buildings, lands, machinery, equipment, freezers, dispensers, and facilities in general for the manufacturing, freezing, processing, compounding, preparing, treating, dispensing, selling, distributing, developing, handling, and dealing in the product known as Dairy Queen, ice cream, frozen custard, and similar, associated or allied products together with the establishment of sublicensees who shall operate under and by authority of the rights held by this corporation for the State of Oklahoma." As early as July 1946 A. C. Deem of Shawnee, Oklahoma, contacted Copelin with with a view to obtaining Dairy Queen rights in Pottawatomie County and Copelin advised Deem that he was not interested in selling a franchise in Oklahoma but, as a result of the persistent importunities of Deem, late in the fall of 1946 Copelin did sell an exclusive Dairy Queen franchise to Deem for Pottawatomie County. Deem opened a Dairy Queen store in Shawnee sometime in the early spring of 1947. Immediately *188 thereafter Copelin was deluged with telephone calls and letters from persons desiring to obtain exclusive franchises for Dairy Queen at other locations in the State. Copelin never solicited anyone to purchase any subfranchise. He was besieged by persons interested in obtaining franchises for Dairy Queen who came to his home or contacted him at the Dairy Queen store in Tulsa. The exclusive rights of territory, formula, and trade name did not constitute stock in trade of the petitioner corporation or other property of a kind which would properly be included in the inventory of the corporation if on hand at the close of the taxable year or property held by petitioner corporation primarily for sale to customers in the ordinary course of its trade or business, or property, used in the trade or business, of a character which is subject to allowance for depreciation. The 19 territorial franchises sold by the petitioner corporation in the year 1948 had been held by petitioner corporation for more than 6 months at the time they were sold. Opinion The statutory definition of "capital assets" contained in section 117 [3] of the Internal Revenue Code of 1939 includes all "property" not *189 excluded. Jones v. Corbyn, 186 Fed. (2d) 450 (C.A. 10, 1950). The facts show that at the time petitioner corporation was organized it acquired from Copelin and the Nehrings a franchise for the distribution of Dairy Queen products within the State of Oklahoma which Copelin had previously acquired from the McCulloughs. We hold that this franchise was property. Citizens State Bank of Barstow, Tex. v. Vidal, 114 Fed. (2d) 380 (C.A. 10, 1940); Jones v. Corbyn, supra.
*190 The respondent contends that the property disposed of was not "capital assets" because it constituted the "stock in trade" of petitioner corporation; that the corporation was in the business of selling off its franchise county by county; and that the corporation was holding the franchise for sale to customers in the ordinary course of its trade or business. In our opinion, the evidence does not support the respondent's contentions. It is true that in the agreement between the Nehrings and Copelin entered into on June 24, 1947, for the purpose of forming a corporation "for the promotion of the Dairy Queen business" within the State of Oklahoma, they recited that they were now operating said business "by operating their own store and by selling franchises for certain specific territories" within the State. There is, however, considerable testimony that it was Copelin's plan and the plan of his associates, the Nehrings, to develop the entire State of Oklahoma themselves, and that in every instance where the subfranchises were made they were made with persons who sought out Copelin and urged him to enter into the agreement. The same was true after petitioner corporation was organized. *191 No effort was made on behalf of the corporation to sell or otherwise dispose of parts of its franchise. This was not its business. Its business was to manufacture and sell Dairy Queen products in its exclusive territory. At no time did it or its agents actively promote sales of subfranchises. Its role in this connection was an entirely passive one. The sales of the subfranchises, in effect, were no more than the partial liquidation of its franchise for the entire state. Under such circumstances, we are unable to find that the unsold territory was the corporation's "stock in trade" or that the corporation was holding its franchise for sale to customers in the ordinary course of its trade or business. We have found as a fact that the opposite was true. In McConkey v. United States, 130 Fed. Supp. 621, the Court of Claims, after citing many cases on this subject, said: "No one factor, obviously, is determinative of whether or not property is held primarily for sale to customers in the ordinary course of one's trade or business. But, among the factors regarded by the courts as important are the activities of the taxpayer, or his agents, in promoting sales, the extent of *192 the development and improvement of the property, the purpose for which the property was acquired, and the frequency and continuity of sales." (Italics supplied.) The activities of the petitioner corporation in the instant case were nil and very much like the situation in the McConkey case where the court, later in its opinion, said: "It would be difficult to conceive of a case where sales were made with less activity on the part of the seller. They merely sat in their home and sold such lots as unsolicited buyers might wish to buy." The primary "purpose" for which Copelin and later the petitioner corporation acquired the exclusive franchise in question was definitely not to sell parts of it to others but to open up and operate Dairy Queen stores of its own. The respondent also stresses the frequency and continuity of the sales of the subfranchises. While this is a factor which must be considered and weighed together with all of the other factors, it is by no means controlling. We emphasized this in Frieda E. J. Farley, 7 T.C. 198, where we said: "Although taking no active steps to sell the property, petitioner was approached by individual purchasers * * *. These *193 unsolicited approaches were what lent the element of frequency and continuity to the sales. Petitioner might have eliminated the frequency and continuity of the sales by selling the entire tract in one piece. * * * It would seem that petitioner could have maintained a more passive role only by refusing to sell at all." We hold, therefore, that none of the exclusions mentioned in section 117(a)(1), supra, apply to the franchise in question and that the subfranchises are "capital assets" as that term is defined in the applicable statute. McConkey v. United States, supra; Frieda E. J. Farley, supra; Altizer Coal Land Co., 31 T.C. 70 (Oct. 15, 1958). On the alternative issue, the parties in the supplemental stipulation of facts filed January 23, 1959, have stipulated the date of sale of each of the 19 territorial franchises that were sold in 1948. Only six of these were sold after July 24, 1948, which would be more than 6 months after petitioner was incorporated. As to the other 13 agreements, the respondent contends that petitioner has not shown that such assets were held for more than 6 months as is required to bring the gain within section *194 117(a)(4) of the 1939 Code. [4] We see no merit in this contention. The organizers of petitioner corporation acquired the franchise for the entire State of Oklahoma in 1946. They used the asset in their partnership business until that business was incorporated in 1948, at which time all the assets of the partnership were transferred to the corporation in a nontaxable exchange so that under section 113(a)(8) of the 1939 Code the basis to the corporation "shall be the same as it would be in the hands of the transferor * * *." Our conclusion is that petitioner corporation comes squarely within the scope and intent of section 117(h)(2) of the 1939 Code, [5] and that the holding period of petitioner corporation for the subfranchises sold in 1948 commenced at the time the organizers of petitioner acquired the franchise for the entire State of Oklahoma in 1946. It follows that the subfranchises sold by petitioner corporation in 1948 were held by petitioner "for more than 6 months" as that phrase is used in section 117(a)(4), supra, and that the gain therefrom is a long-term capital gain. Decisions will be entered under Rule 50. Footnotes
1. Transferee proceedings of the following petitioners are consolidated herewith: L. H. Nehring. Alleged Transferee, Docket No. 48221; Priscilla Nehring, Alleged Transferee, Docket No. 48222; and L. E. Copelin, Alleged Transferee, Docket No. 48237.↩
2. In the last sentence of the restatement beginning "having determined that more than 80 per cent of petitioner's 1948 income," the year should be 1949 instead of 1948.↩
3. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital Assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1) * * *
(4) Long-Term Capital Gain. - The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing net income; * * *
(h) Determination of Period for Which Held. - For the purpose of this section - * * *
(2) In determining the period for which the taxpayer has held property however acquired there shall be included the period for which such property was held by any other person, if under the provisions of section 113, such property has, for the purpose of determining gain or loss from a sale or exchange, the same basis in whole or in part in his hands as it would have in the hands of such other person.↩
4. See footnote 3. ↩
5. See footnote 3.↩