Estate of G. R. Gowdey, Deceased, and Verna E. Gowdey as Executrix and Surviving Spouse v. Commissioner.
Estate of Gowdey v. Commissioner
Docket No. 48165.
United States Tax Court
T.C. Memo 1961-112; 1961 Tax Ct. Memo LEXIS 238; 20 T.C.M. (CCH) 555; T.C.M. (RIA) 61112; April 19, 1961
*238 Decedent, G. R. Gowdey, died in 1956. In 1948, while living in Oklahoma, decedent acquired a master Dairy Queen franchise for the entire State of Virginia at a cost of $40,000, plus 4 cents a gallon on all mixes used or sold within the State of Virginia. Decedent and his wife then moved to Virginia. During the taxable years 1949 and 1950 decedent entered into 14 subfranchise agreements under which the respective second parties paid a lump sum upon the signing of the agreement and 35 cents for each gallon of mix used in the machines. Held, the 14 subfranchise agreements were license agreements rather than sales of property and the payments received thereunder (both lump sum and gallonage) were royalties taxable as ordinary income. Theodore E. Moberg, 35 T.C. 773 (Feb. 24, 1961), followed. Held, further, since the subfranchises were licenses and not sales of property, there was no occasion to allocate a part of the cost of the master franchise to the several subfranchises for the purpose of determining gain or loss from the sale of property. Carl F. Bauersfeld, Esq., and Charles H. Burton, Esq., for the petitioners. Mark H. Berliant, Esq., for the respondent. *239 ARUNDELL
Memorandum Findings of Fact and Opinion ARUNDELL, Judge: Respondent determined deficiencies in income tax for the years 1949 and 1950 in the amounts of $4,222.24 and $18,367.30, respectively. Petitioners claim overpayments for both years. The issues remaining for decision are: (1) Whether certain amounts (both lump sum and gallonage payments), received by "first party" G. R. Gowdey, now deceased, during the taxable years 1949 and 1950 from the "second parties" to 14 subfranchise agreements entered into during those years with Gowdey, represent proceeds from the sales of capital assets or royalties taxable as ordinary income, and (2) whether a part of the cost of a master franchise acquired by Gowdey in 1948 should be allocated to the 14 subfranchises for the purpose of determining gain or loss from the alleged sales of such subfranchises. A third issue regarding the amount of depreciation allowable on certain Dairy Queen machines was settled by stipulation and effect will be given to such settlement in recomputations to be made under Rule 50. Findings of Fact The stipulated facts are so found and are incorporated herein by this reference. During the taxable *240 years 1949 and 1950, G. R. Gowdey, now deceased, and Verna E. Gowdey were husband and wife residing in Richmond, Virginia. They filed Federal income tax returns for these years with the then collector of internal revenue for the Virginia district at Richmond, and later filed a petition with this Court. G. R. Gowdey died December 11, 1956. On March 25, 1957, it was ordered that henceforth the caption of this case shall be as above stated. For convenience the decedent will sometimes be referred to herein as petitioner. Harry M. Oltz, on May 18, 1937, secured Patent No. 2080971 on a "Freezing and Dispensing Machine" which later became known as the Dairy Queen machine. In a contract dated and acquired by H. A. McCullough on July 29, 1939, and accepted and signed by Oltz on July 31, 1939, McCullough obtained from Oltz the exclusive right to manufacture machines covered by Patent No. 2080971 in certain states of the United States, including Virginia. McCullough was to furnish the mix to make the product to be frozen and pay Oltz a per gallon "royalty" on all mix that went through the machines. McCullough was to own the machines and have the right to furnish such machines to other persons *241 in his territory and pay Oltz his regular royalty. Payments to Oltz were to be continued as long as the machines were used irrespective of the life of the patent. On June 11, 1940, Oltz, for $1 and other good and valuable consideration, sold, assigned and transferred the whole right, title and interest in and to Patent No. 2080971 to Ar-Tik Systems, Inc., a corporation of the State of Indiana. On September 7, 1946, Ar-Tik Systems, Inc., and McCullough, by written agreement, amended and construed the above-mentioned July 1939 agreement between Oltz and McCullough in several respects, the principal amendment being paragraph 11 of the original agreement which was amended to read as follows: It is understood that I [McCullough] shall have the exclusive right and license to the use, manufacture, sale and distribution of all machines built under Patent No. 2080971 within the described territory. This shall include the right and privilege of granting sublicenses to others for territorial rights and also for the manufacture of said machines, provided however, where I grant to others the right to manufacture such machines it shall be with the understanding that the use of the machines *242 so manufactured shall be limited to the territory of the sublicensee. On October 14, 1946, H. A. McCullough and John F. McCullough registered the trade name "Dairy Queen" in the office of the Secretary of State for the State of Virginia. Petitioner was a food broker prior to 1948. He operated his business and maintained his home in Oklahoma City, Oklahoma. He and his wife became interested in the Dairy Queen business after observing operation of stores in Oklahoma. On September 29, 1948, Hugh A. McCullough and John F. McCullough, as parties of the first part, and G. R. Gowdey, as second party, entered into a written agreement, [1] which we incorporate herein by reference. In this agreement the first party granted unto the second party the rights to the use of Dairy Queen machines and the trademark "Dairy Queen" within the State of Virginia in consideration for the payment to the first party of $40,000 and the payment to Ar-Tik Systems, Inc., of the sum of 4 cents a gallon on all mixes used or sold within the State of Virginia. Paragraph 6 of the agreement provides in part: 6 That the Second Party shall have the right to sub-contract to other parties within said territory providing *243 however, that each sub-contractor be governed by the provisions of this agreement. * * * Pursuant to the agreement of September 29, 1948, petitioner paid to the McCulloughs the amount of $40,000 provided for in the agreement. During 1949 and 1950 petitioner entered into three and eleven "Dairy Queen Franchise [Agreements]," respectively, with certain other parties. A sample agreement was stipulated and is incorporated herein by reference. In this agreement petitioner was referred to as "Party of the First Part" and the other party as "Licensee." After the recitations it was agreed that first party shall furnish for use of the licensee within Virginia certain Dairy Queen freezers; that such freezers shall remain the personal property of the first party; that the licensee shall keep the freezers in good operating condition and repair; that in consideration for the use of the freezers and the trademark "Dairy Queen" the licensee shall pay a lump sum at the date of execution of the agreement and a continuing royalty of 35 cents per gallon for each and every gallon *244 of mix used or sold within the territory of Virginia; and that the licensee shall keep records, furnish a suitable location, and at all times maintain the standards and quality set up by first party with respect to the frozen product, cones, cups, toppings, flavors, etc., as well as to cleanliness and sanitation. It was also agreed that the licensee was to dispense no product from the freezers or store other than "Dairy Queen" frozen food; that the licensee shall purchase his mix from a source named and approved by the first party; and that if the licensee should violate any of the material obligations of the agreement, the first party is given the right to enter the store and remove "his said freezers" free and clear of any damage for the trespass in effecting such repossession. During the year 1949 petitioner received $12,000 representing the lump-sum payments provided for in the franchise agreements and $5,588.10 as representing the amounts paid for the continuing royalty of 35 cents per gallon. In their joint income tax return for 1949 petitioners reported the $5,588.10 as ordinary income. The lump-sum payments ($12,000) were treated as a reduction of the $40,000 paid to the *245 McCulloughs and no portion thereof was recognized as income. Respondent's determination did not disturb the manner in which the petitioners reported the $5,588.10. Respondent in his statutory notice of deficiency determined that the $12,000 received by petitioner from licensees represented ordinary income. During the year 1950 petitioner received $44,000 representing the lump-sum payments provided for in the franchise agreements and $30,693.90 as representing the amounts paid for the continuing royalty of 35 cents per gallon. In their joint income tax return for 1950 petitioners reported the $30,693.90 as ordinary income. The $44,000 was reduced by $18,723.41 of alleged cost basis from the $40,000 master franchise cost and the net difference, $25,276.59, was reported as a net long-term capital gain. Respondent's determination did not disturb the manner in which the petitioners reported the amount of $30,693.90. Respondent in his statutory notice of deficiency determined that the $44,000 received by petitioners from licensees represented ordinary income. In a statement attached to the deficiency notice, the respondent explained his determination thus: (a) The income from sublicenses *246 which was reported on your return as long-term capital gains has been determined to be ordinary income. Your contentions that this income should be reduced by an allocable portion of your cost of the original license have been denied. Ultimate Findings of Fact The lump-sum payments of $12,000 and $44,000 received by petitioner during the years 1949 and 1950, respectively, pursuant to the 14 Dairy Queen franchise agreements, constitute advance royalties for the use of Dairy Queen rights in the various counties (or cities) covered in the agreements, and such amounts are royalties taxable to petitioners as ordinary income. The amounts of $5,588.10 and $30,693.90 reported by petitioners on their joint income tax returns for the years 1949 and 1950, respectively, as gross income from royalties, were properly reported and are taxable as ordinary income. No reduction against amounts reportable as lump-sum or gallonage payments is allowable for the cost basis of the master franchise. Opinion Prior to 1949 petitioner and his wife lived in Oklahoma. It was there that petitioner learned of Dairy Queen and acquired a master franchise from the McCulloughs for the entire State of Virginia *247 on September 29, 1948. The 14 Dairy Queen franchise agreements, a sample of which has been stipulated, are in substance a paraphrase of the 36 Dairy Queen franchise agreements involved in Dairy Queen of Oklahoma, Inc., 26 T.C. 61 (see p. 66). In fact, petitioner Verna E. Gowdey, the widow of the decedent, testified that the 14 agreements "were more or less copied from the Oklahoma franchise." Petitioners apparently concede this for they state in their brief: The facts in this case are indistinguishable from the facts in the case of Dairy Queen of Oklahoma, Inc. In fact, the instant case was continued by this Court on numerous occasions on the basis that the issues involved were substantially the same as the issues in the case of Dairy Queen of Oklahoma, Inc. In Dairy Queen of Oklahoma, Inc., supra, we held that the 36 Dairy Queen franchise agreements there involved were licensing agreements rather than sales of property and that the payments received thereunder (both lump-sum and gallonage) were royalties taxable as ordinary income. We were, however, reversed by the Tenth Circuit, in which Circuit Judge Lewis wrote a dissenting opinion. See Dairy Queen of Oklahoma v. Commissioner, 250 F.2d 503. *248 Of course, petitioners here contend that we should now follow the Tenth Circuit and decide for them. We recently had before us another Dairy Queen case involving numerous franchise agreements in the States of Oregon and Washington emerging from the Oltz Patent No. 2080971 in which we adhered to our views on this issue as expressed in Dairy Queen of Oklahoma, Inc., supra, as to all the agreements there involved with the single exception of the one agreement entered into with A. & M. Concessions, Inc. See Theodore E. Moberg, 35 T.C. 773 (Feb. 24, 1961). In the instant case the 14 Dairy Queen Franchise agreements have no similarity with the A. & M. Concessions, Inc., agreement involved in the Moberg case. As we said above, they are in substance a paraphrase of the 36 Dairy Queen franchise agreements involved in the Dairy Queen of Oklahoma, Inc., case, supra. We hold, therefore, that the 14 agreements here involved were licensing agreements rather than sales and that the payments received thereunder (both lumpsum and gallonage) were royalties taxable as ordinary income and not as long-term capital gains. Theodore E. Moberg, supra. It follows from our *249 holding above that since the 14 Dairy Queen franchise agreements were licenses and not sales of property, there is no occasion to allocate a part of the cost of the master franchise to the several subfranchises for the purpose of determining gain or loss from the sale of property. Because of the depreciation issue which has been stipulated, Decision will be entered under Rule 50. Footnotes
1. This agreement is referred to in the stipulation as "Exhibit 1-A" but is erroneously marked as "Exhibit 1-B."↩