CARROLL PRESSURE ROLLER CORPORATION, AN OREGON CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE RESPONDENT.

Docket No. 61585. Filed September 30, 1957.

*Walter H. Pendergrass, Esq.*, for the petitioner.
*John D. Picco, Esq.*, for the respondent.

OPINION.

MULRONEY, *Judge:* The respondent determined a deficiency in income tax and liabilities for personal holding company surtax, as follows:

| Fiscal year ending May 31 | Income tax | Personal holding company surtax |
|---|---|---|
| 1952 | $381.41 | $9,342.03 |
| 1953 | | 10,.759.08 |

The issue in the case is whether petitioner's transfer of patent rights under a "License Agreement" effected a mere licensing arrangement or whether the transfer accomplished an assignment and sale of the patent rights with the proceeds taxable to the petitioner as capital gain under section 117 of the Internal Revenue Code of 1939.

All of the facts were stipulated and are found accordingly. Petitioner is an Oregon corporation with its principal place of business in Portland, Oregon. It was incorporated on September 30, 1948, and it filed its corporate income tax returns for the corporate fiscal years ending May 31, 1952 and 1953, with the district director of internal revenue for the district of Oregon, at Portland, Oregon.

On October 18, 1948, W. C. Carroll, J. A. Carr, and Robert D. Pike assigned to petitioner all of their right, title, and interest in and to a certain invention described in the application filed by the said assignors on June 16, 1945, bearing serial number 599,884. In exchange therefor they received 98 per cent of the stock of the petitioner. On or about December 6, 1949, U. S. Patent No. 2,490,027 was issued to petitioner pursuant to said application.

The device for which the patent was issued is a track roller particularly adaptable for use with crawler-type tractors and lubricated by a lubricant carried internally within the roller under pressure. Subsequent to the issuance of the patent, petitioner attempted to enter into suitable arrangements with other parties for the manufacture, use, and sale of the device. It was not successful in making arrangements satisfactory to it until April 7, 1951, when, after negotiations, it entered into a "License Agreement" with its principal stockholder, William Craig Carroll, also known as W. C. Carroll, doing business as Craig Carroll Company, hereinafter sometimes referred to as Carroll, granting to him, during the life of the patent, "an exclusive license to manufacture, use and sell throughout the United States, its territories and dependencies, and to export to foreign countries," the device described in said patent. As consideration for the transfer, Carroll agreed to pay petitioner "a royalty of one per cent (1%) of the wholesale price of each pressure roller assembly or part thereof manufactured and sold by him * * *."

In the taxable year ending May 31, 1952, petitioner received the sum of $16,527.10 paid to it by Carroll pursuant to the terms of the license agreement and in the taxable year ending May 31, 1953, petitioner received the sum of $19,729.43 paid to it by Carroll under said license agreement. Petitioner reported these amounts as capital gains in its corporate income tax returns for said taxable years.

Under its articles of incorporation, petitioner was empowered, *inter alia*, to buy and sell patents. The only patent ever owned by petitioner is the one described above and petitioner's whole source of income, with the exception of about $100 interest, since incorporation has been the amounts received under the license agreement dated April 7, 1951.

Respondent determined the license agreement effected a mere licensing arrangement and that the amounts received by petitioner in the taxable years represented royalties derived from a licensing agreement. Accordingly, respondent determined the deficiencies in income tax and personal holding company surtax as hereinabove set forth.

In the notice of deficiency respondent determined the agreement of April 7, 1951, between petitioner and William Craig Carroll "constitutes nothing more than a license agreement under which [petitioner] received royalties from Mr. Carroll for the exclusive license to manufacture, use and sell the articles covered by the patent issued to [petitioner]. Accordingly, the sums received by [petitioner] from the said William Craig Carroll under this agreement are determined to be ordinary income."

Respondent states in his brief that the issue to be decided is as follows:

The sole question for determination involves the tax consequences resulting from the transfer of certain patent rights under an agreement executed by petitioner and Carroll on April 7, 1951. Petitioner claims that this agreement was for the sale of the patent and that the amounts in question were installment payments of the purchase price, taxable as capital gains under section 117 of the 1939 Code. In the deficiency notice respondent determined that the payments were in fact royalties derived from a licensing arrangement and hence taxable to the petitioner as royalty income under section 500 of the Code.

We have set forth this quotation from respondent's brief for there is some suggestion in the written argument that respondent is now contending the patent was not a capital asset. This contention was not advanced either in the pleadings or in the original notice of deficiency. This is a fully stipulated case and it is apparent the stipulation was prepared without notice that such an issue would be presented. However, it is noted that it is stipulated that "[s]ubsequent to the issuance of the patent, petitioner attempted to enter into suitable arrangements with other parties for the manufacture, use and sale of the device." The first mention that respondent was questioning whether the patent was a capital asset came in the opening statement of respondent's counsel where he said there "is some question" about this and he stated it is a question "which we may brief." We have serious doubts as to whether the issue of the patent's being a capital asset is properly before the Court. *F. H. Philbrick*, 27 T. C. 346; *Sicanoff Vegetable Oil Corporation*, 27 T. C. 1056. But if it is, the

fair interpretation of the entire stipulation is that petitioner was holding the patent with the intention of manufacturing, using, or selling the device, through some arrangement with other parties; that it was a capital asset. It was stipulated it was the only patent petitioner owned. Its sole income from the date of its incorporation, with the exception of about $100 interest, was the money paid by Carroll pursuant to the agreement.

Petitioner's argument is that the agreement of April 7, 1951, granting an exclusive right to William Craig Carroll to make, use, and sell the patented article constitutes a sale or assignment of its patent rights. Petitioner relies upon *Roy J. Champayne*, 26 T. C. 634; *Arthur C. Ruge*, 26 T. C. 138; *Vincent A. Marco*, 25 T. C. 544; *Edward C. Myers*, 6 T. C. 258; *Ernest E. Rollman*, 25 T. C. 481; *Allen* v. *Werner*, 190 F. 2d 840; *United States* v. *Carruthers*, 219 F. 2d 21; and *Storm* v. *United States*, 243 F. 2d 708.

In *Vincent A. Marco, supra,* we said (p. 547):

It is now well established by the weight of authority that the grant of the exclusive right to manufacture, use, and sell a patented article constitutes a sale of the patent rights with the proceeds taxable as long-term capital gain, provided (1) the invention constitutes a capital asset in the hands of the grantor, and (2) it was held by the grantor for the required period. Proceeds from such a grant constitute long-term capital gain income whether payment is made in a lump sum or over a period of years based on the use of the invention by the grantee. This was what we held in *Edward C. Myers*, 6 T. C. 258. That case has been frequently cited and followed by us. In our decision in that case, we based it largely on the Supreme Court's decision in *Waterman* v. *Mackenzie*, 138 U. S. 252. This latter case was not a tax case but did deal with the question as to when a patent agreement amounted to a mere license and when it amounted to a sale.

Respondent's main argument is that the above cases were all wrongly decided and should be overruled. We need not again go into the basic principles which caused this and most other courts to decide that the grant of the exclusive right to make, use, and vend a patented article with the purchase price geared to the production of the patented article, amounts to an assignment of the patent right. We have consistently followed our early determination to that effect in *Edward C. Myers, supra*. We see no reason to depart from the law as pronounced in the cited cases.

Respondent also argues that the instant case is distinguishable from the above-cited cases; that in the agreement of April 7, 1951, the petitioner retained certain rights which are inconsistent with an assignment of patent rights, and therefore, the agreement was a mere licensing agreement. Respondent concedes reference to the parties as licensor and licensee is not controlling but contends such reference and certain provisions of the agreement, when considered together, establish that the agreement was one of license and not of sale.

Respondent points to a number of retention of rights items found in the license agreement which he argues require a construction of the agreement as a license rather than a sale. They are (1) retention of right to receive royalties or future profits from sales, (2) retention of right to exploit the patent in foreign markets, (3) limiting Carroll as to sublicensing and prohibiting Carroll from assigning his rights under the agreement without its consent, and (4) retention of right to terminate on breach.

Items (1), (2), and (4) can be found in exact duplicate or substantial counterpart in such cases as *Edward C. Myers, supra, Vincent A. Marco, supra,* and *Roy J. Champayne, supra.* As to item (3), we find no clause in the agreement limiting the right to sublicense. Clause 11 grants Carroll "the right to sub-license the manufacture or sale, or both, of the pressure roller assemblies or parts without the consent of the CORPORATION having first been obtained" but Carroll is to be responsible for the payment of the royalties and the rendering of accounts by the sublicensees the same as if he had manufactured and sold them himself. The last is not a limitation on the right to sublicense. It is a statement that the licensee cannot limit his liability by sublicensing—a statement that probably expresses what Carroll's obligation would be if the statement had been omitted.

In clause 12 of the agreement, it is provided :

It is agreed that CARROLL shall not assign his interest in this License Agreement, or any part of his interest therein, without having first obtained the express consent in writing of the Board of Directors of the CORPORA-TION or of a majority of the stockholders of the CORPORATION, except that CARROLL may sub-license as hereinabove provided.

In *Allen* v. *Werner, supra,* there was a clause in the agreement giving the grantee the right to cancel on 90 days' written notice and a clause prohibiting the licensee from assigning its interest except in connection with the transfer of its entire business, assets, and goodwill. There was also a clause permitting termination if the licensee violated the provisions. The court held (190 F. 2d at 842) :

A provision authorizing termination of the right conveyed upon the failure of the assignee to comply with the terms of the agreement provides a stated event upon the occurrence of which the grantor may terminate the right and title theretofore conveyed and enjoyed. Nor does the existence in the grantee of the right of cancellation, or the prohibition of unlimited assignment require, under the circumstances here, determination that the agreement did not evidence a sale. [Citations.]

In the judicial discussion in the authorities on this subject the courts consider the nature of patent rights; and the fact that the agreements transferring the right to make, use, and vend also contain other usual clauses designed to require proper effort to promote the manufacture and sale of the patented article, is generally held not to

require a determination that the agreement did not evidence a sale.

In *Storm* v. *United States, supra,* where the grant of the license agreement was to "manufacture, use and sell" and the argument was other clauses showed retention of rights inconsistent with the license agreement intending a sale, the court held (243 F. 2d at 711) :

> Where the language of the operative words effecting a transfer are clear and their meaning is plain any doubt as to whether the transfer has been restricted or conditioned by a subsequent clause will be resolved against the asserted restriction or condition.

It is significant that there was in the instant case unlimited right to sublicense. The prohibition against complete assignment of the license contract without licensor's consent is understandable where the payment for the transfer of total rights is to depend on future profits from manufacture and sale. We hold the license agreement did release all of the rights of the petitioner to Carroll in the patent property, which means the agreement evidenced a sale.

Respondent points to the difference between the instruments assigning the invention to petitioner and the license agreement. The instrument of transfer by the inventors to petitioner in 1948 was styled an "assignment" and couched in the language of an outright conveyance. Respondent argues this shows the later instrument, styled "License Agreement," was intended to create a licensing arrangement. But the earlier agreement was a completed transaction immediately. The transfer by the inventors was for 98 per cent of the stock of petitioner. The second was a transfer of all rights under the patent for a purchase price ascertainable in the future. The second transfer could not employ the contract form applicable to a transaction where the purchase price is immediately ascertainable and paid. It is enough that the license agreement that evidences the transaction here involved was, in form and substance, exactly what this and most all other courts have many times said effected a sale.

*Decision will be entered for the petitioner.*