234

Karl LEUBSDORF and Bertha Leubsdorf

v.

UNITED STATES.

No. 465–55.

United States Court of Claims.

July 16, 1958.

Martin A. Roeder, New York City, for plaintiffs.

Theodore D. Peyser, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Charles K. Rice, for defendant. James P. Garland, Washington, D. C., was on the brief.

MADDEN, Judge.

The plaintiffs sue for the refund of part of the income taxes which they paid for the years 1951, 1952, and 1953.[1]

It is the plaintiffs' position that certain amounts, which were reported on their joint income tax returns for those years as income from royalties from patents and treated as ordinary income, were, in fact, received in connection with the sale of a capital asset, i. e., the patents, pursuant to an agreement dated December 19, 1940, and therefore constituted long-term capital gains within the meaning of section 117(a) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 117(a). The question before this court is whether or not the agreement of December 19, 1940, or any subsequent transaction, constituted a sale by the patent owners, including Karl Leubsdorf, of all their substantial rights in the patents, to a person from or through whom the persons who made the payments to them in the years in question traced their title.

The plaintiff Karl Leubsdorf and others, hereafter referred to as the "Leubsdorf group", in 1936 purchased two patents known as the "Rollmann patents" covering methods for manufacturing shoes with a rubber midsole. As the result of this purchase, Karl Leubsdorf acquired an undivided 77/150ths interest in these patents.[2] The Leubsdorf group

---

1. Bertha Leubsdorf is a party to this suit only because she filed joint income tax returns with her husband, Karl Leubsdorf, for the years here in question.

2. Karl Leubsdorf has never acted as a broker or agent for others in connection with the sale of patents, or the issuance of licenses under patents, and except for the patent interests involved in this suit, he has never owned any patents or interests in patents, and since he had

subsequently assigned the patents in trust to Grunebaum, a member of the group, to act as trustee for the group in granting licenses and in otherwise dealing with the patents. At about the time the Leubsdorf group acquired the Rollmann patents, the outstanding license of those patents to United States Rubber Products, Inc., became nonexclusive because of that company's failure to pay the minimum amount of royalty.

In 1939, Grunebaum, as trustee for the Leubsdorf group granted to Pirelli Limited a nonexclusive license "to manufacture and/or sell" footwear under the Rollmann patents in the United States until December 31, 1941, at which time this license expired, no payments having ever been made to the Leubsdorf group thereunder.

The Rollmann patents were pooled with the Rajeh patent by an agreement dated April 17, 1940, under the terms of which Grunebaum as the trustee of the Leubsdorf group granted to Heinz Rollmann, the son of the inventor of the Rollmann patents and the representative of the owners of the Rajeh patent, an exclusive authority to grant licenses under these patents, provided that Grunebaum or his representative gave his written approval. Forty percent of all royalties received under licenses so granted were to be paid to the owners of the Rollmann patents, and the agent designated to transmit the royalties to the parties was the Chase Naional Bank of the City of New York.

The next transaction involving the Rollmann patents was the agreement of December 19, 1940. That agreement was between the owners of the Rollmann patents (represented by Grunebaum and by Heinz Rollmann) and the owners of the Rajeh patent (represented by Heinz Rollmann), on the one hand, and Rikol, Inc. (represented by Leo Weill), on the other hand. Rollmann represented the owners of both the Rajeh and Rollmann patents pursuant to the April 17, 1940 agreement and a certain power of attorney executed

pursuant thereto. By virtue of this power of attorney, Rollmann had full authority to act on behalf of Grunebaum in the granting of a license or licenses under the Rollmann patents, and this fact was stated in the December 1940 contract. Leo Weill, a shoe manufacturer in Europe, had started negotiating with Heinz Rollmann in reference to certain patents while he was still in Europe and continued such negotiations after coming to the United States. Weill had organized Rikol as a holding company through which to conduct his business activities. At the time of the December 1940 contract, Weill was the sole stockholder and an officer of Rikol.

Weill had wanted to secure exclusive rights under the Rollmann and Rajeh patents, and the 1940 contract which was finally executed granted to Rikol "an exclusive license (except for the two nonexclusive licenses now outstanding * * *) for the manufacture and sale of shoes * * *" under these patents. The word "use" was omitted from the granting clause of the December 1940 contract, but the evidence shows that such omission was inadvertent and did not signify a purpose to retain for the owners any rights in these patents. The agreement was for a period of 15 years, and Rikol agreed to pay the patent owners a prescribed percentage of the net cash receipts from the sale of footwear manufactured under the patents.

Rikol never manufactured any footwear. It was never intended by Leo Weill that Rikol would actually produce the shoes. The terms of the contract expressly provided in paragraph 10:

"Rikol agrees that it will not grant sub-licenses * * * unless it shall first receive the written consent of Rollmann thereto; except, however, that Rikol shall have the right to grant licenses to any corporations or other enterprises in which Leo Weill shall directly or indirectly control a majority of the stock. * * *"

held the patents here in question for more than 18 months prior to December 19,

1940, they were capital assets in his hands.

Acting pursuant to this authorization, Leo Weill organized Wellco Shoe Corporation, taking the letters W-e-l-l from his own name, which company was set up to manufacture shoes under the patents. Weill was the president of and owned a controlling interest in Wellco for serveral years after the corporation was organized.

On March 19, 1941, Rikol entered into an agreement with Wellco, granting to the latter "an exclusive license for the manufacture and sale" of shoes under the Rollmann patents. This 1941 agreement recited that Rikol had earlier "obtained a license with respect to the use of" the Rollmann patents. The royalty payments were based on the same percentage of net cash receipts as that prescribed in the 1940 agreement which had granted the exclusive license to Rikol, but the 1941 contract made no provision for the transmittal of the royalty payments from Rikol to the persons who granted the license to Rikol or from Wellco to Rikol. That agreement also provided that it should expire one year later. The 1941 agreement was signed by Harry Schneider as president of Rikol and by Leo Weill as president of Wellco. It can be assumed that this is the same Mr. Schneider who later became a stockholder of Rikol. At this time, however, Weill was apparently still the sole stockholder of Rikol, and also owned a controlling interest in Wellco.

After the 1941 contract was consummated, a factory was constructed by Wellco, and special machinery for the manufacture of the footwear was purchased and installed, but the commencement of World War II with its shortages of rubber soon made it necessary to halt the manufacture of these shoes for the duration of the war, and to manufacture other items not covered by the patents involved in this suit.

The one-year agreement of 1941 between Rikol and Wellco was never extended in writing, apparently because Weill and Heinz Rollmann felt it was unnecessary since Rollmann was or soon became an employee of Wellco. Heinz Rollmann told Mr. Weill: "We don't have to make a new agreement, since I am entering the company anyhow." Weill was, for all practical purposes, the *alter ego* of both Rikol and Wellco at this time, and Rollmann represented the Leubsdorf group and the owners of the Rajeh patent under the authority granted to him by the April 1940 pooling agreement.

Weill seems to have gradually faded out of the picture, and by the time of the trial of this case, he had no interest in either of the two corporations or in the patents. He remained with Rikol until some time around 1943, by which time a Mr. Jaffin and a Mr. Schneider had become stockholders of that corporation. He retained a controlling interest in Wellco until about 1944 or 1945 at which time he sold stock to Heinz Rollmann and to a Mr. Feistmann, retaining only a one-third interest in Wellco which he ultimately disposed of some time in 1947. Some time in 1945, after Weill had severed all connection with Rikol and no longer controlled Wellco, rubber became available and Wellco resumed the manufacture of footwear using the Rollmann patents. No written instruments were executed at this time, but Heinz Rollmann, who apparently still represented the Leubsdorf group by virtue of the agreement of April 17, 1940, was an officer and stockholder of Wellco and was actively engaged in managing the company's affairs.

From 1945 to 1947 payments of royalties were made to the owners of the Rollmann and Rajeh patents computed on the basis of three percent of the net cash receipts from the sale of the shoes manufactured under those patents. This three percent figure was the figure contained in both the December 1940 agreement and the March 1941 agreement. In 1947 this figure was changed to two percent under the following circumstances. On May 27, 1947, Heinz Rollmann, who was then the president of and a stockholder in Wellco and who was acting as the representative of the owners of the Rollmann and Rajeh patents, addressed a letter to Rikol which purported to reduce

from three to two percent the amount of royalties to be paid by Rikol pursuant to the December 19, 1940 agreement in consideration of an extension of that agreement for an additional five years. This modification was agreed to by Otto Feistmann who was acting as representative of Rikol, and who apparently was the same person to whom Weill had earlier sold some of the stock of Wellco, Heinz Rollmann being the other person to whom Weill had sold such stock. It is not known whether Feistmann owned any stock in Rikol or was merely acting as an agent of Rikol. Heinz Rollmann was acting as the representative of the owners of the Rollmann and Rajeh patents, apparently still under the terms of the April 1940 pooling agreement, although Grunebaum did not join with Rollmann in extending this agreement. We do not know whether it was contemplated by the parties that Grunebaum must, under the terms of the April 1940 pooling agreement, approve extensions of licenses or only the original granting of licenses, or whether the power of attorney executed pursuant to that agreement had placed sole authority in the hands of Heinz Rollmann. Grunebaum also seems to have faded out of the picture, and the present record does not indicate what became of him.

There is no proof that Rikol ever paid any royalties directly or indirectly to the owners of the Rollmann patents or that Wellco ever paid any royalties to Rikol. As we have already stated, the precentage established for computation of royalty payments was the same under both the December 1940 contract and the 1941 agreement. April 1940 pooling agreement had designated The Chase National Bank of the City of New York as the agent to receive all royalties paid under licenses granted pursuant to that pooling arrangement. The December 1940 contract provided that transmittal of the royalty payments would be handled through New York Hanseatic Corporation; the 1941 contract between Rikol and Wellco contained no provision as to the transmittal of payments. The pay-

ments actually received by the plaintiff herein were transmitted by New York Hanseatic, together with notations that such payments came from Wellco.

As we have indicated, the letter of May 27, 1947 purportedly extended the December 1940 contract. That contract was also referred to in the 1946 partnership agreement which we will discuss below.

Prior to the purported contract modification, the Leubsdorf group had organized a partnership known as "Karl & Company" to hold and exploit the Rollmann patents. This partnership agreement recited that "the parties together are the *owners* of * * * [The Rollmann patents] relating to shoes and the manufacture thereof, together with the right * * * to certain portions of the income from license agreements with Rikol, Inc. and Wellco Shoe Corporation * * *." [Italics added.] This partnership, late in 1946 or early in 1947, entered into an agreement with Roka, Ro-Search Incorporated and The Rollmanns (a partnership) for the development of improvements on certain patents and to make know-how and general assistance agreements in the shoe field for the benefit of all the parties to the contract. This contract, which is quoted in our finding 31, stated that the partnership of Karl & Company was the "owner" of the Rollmann patents. This contract was dated retroactively as of May 1, 1945, a date prior to the formation of the partnership of Karl & Company.

The next transaction in connection with the Rollmann patents was an agreement of September 21, 1951, whereby Wellco, Ro-Search Incorporated, and The Rollmanns granted to General Shoe Corporation "an exclusive right and license, except as hereinafter retained by Licensors, to manufacture and sell throughout the United States of America footwear covered by" the Rollmann and Rajeh patents and certain other patents. This licensing agreement in no way affected the operations of Wellco in manufacturing and selling footwear under the Rollmann patents, which operations con-

tinued down to the date of the trial of this case without objections from the owners of the Rollmann patents, Rikol or anyone else.

We are of the opinion that the facts of this case, which have been recited at great length, show that the plaintiff Karl Leubsdorf and the other owners of the Rollmann patents did not effectively transfer to any other party or parties all of their substantial rights in these patents so as to constitute a sale of a capital asset thereby making the payments here in issue taxable as long-term capital gains.

It is true that the agreement of December 19, 1940 purported to be an absolute sale of all rights and interests in the Rollmann patents. Leo Weill who was, in fact, Rikol desired to obtain all the rights under the patents which the owners thereof possessed. The evidence shows that the owners intended to sell all their interests in the patents notwithstanding the omission of the word "use" from the granting clause in the 1940 contract. But however absolute the terms of that agreement and whatever the intentions of the parties thereto at that time, the facts show that this agreement subsequently was abandoned or became, at most, a mere licensing arrangement.

Rikol never produced any shoes under the patents; Leo Weill, who was Rikol and who organized Wellco to produce the shoes, gradually dropped out of the picture and left the patents still under the control of the original patent owners. The one-year agreement between Rikol and Wellco was never extending in writing, apparently because the identity of Rikol and Wellco in the person of Leo Weill, plus the fact that Heinz Rollmann, who represented the patent owners through the April 1940 pooling agreement, was coming into Wellco as an employee, made a formal extension of the agreement seem unnecessary to the parties. Wellco actually manufactured shoes under these patents without having any written contract. Heinz Rollmann, who later became president of and a stockholder in Wellco, at the trial testified that he did not know whatever became of Rikol. He did, of course, know and work with Leo Weill at Wellco.

The payments involved in this suit were received by the plaintiff Leubsdorf from Wellco. The plaintiffs contend that Wellco was making those payments on behalf of Rikol. In support of their contention, the plaintiffs can only urge the court to infer that Wellco was acting on behalf of Rikol in making these payments. The record shows that Rikol never made any direct payments pursuant to the 1940 contract, and that Wellco never made any payments to Rikol pursuant to the 1941 contract. The payments were actually transmitted by the agent named in the old 1940 agreement with Rikol, but the transmittal sheets, received by Karl Leubsdorf, stated that the payments came from Wellco. There was never any written provision, even in the one-year agreement of 1941, as to how or to whom Wellco would transmit its payments. These payments from Wellco were not pursuant to any written agreement. If such payments were made on behalf of Rikol pursuant to the 1940 contract, that fact is not proved by the present record. Wellco did not have any title to the patents and made these payments to Karl Leubsdorf as a licensee in a somewhat informal business arrangement.

Whatever the business arrangement was, it was a most informal one. Such informal operations were possible only because Heinz Rollmann who represented the owners of the patents participated in the activities. The plaintiff Leubsdorf and the other patent owners felt safe to proceed in this informal manner, because their rights were being protected by their representative. They were not concerned with the details of the business; they owned and controlled the patents at all times; they were receiving their royalty payments under various licensing agreements, and they did not care about the informal manner in which the operations were being conducted by these licensees.

Heinz Rollmann addressed the letter of May 27, 1947 to Rikol purporting to extend the 1940 contract, and the 1946 partnership agreement creating Karl & Company also spoke of the existence of the 1940 contract with Rikol. There is no question as to the physical existence of such a document. These references to the existence of such a contract do not, of course, prove its legal effect. The actions of the original patent owners, acting through Heinz Rollmann, show that they regarded the 1940 agreement as a mere licensing arrangement and not as a sale. The partnership agreement, referred to above, recites that the parties thereto are "the owners" of the Rollmann patents and have the rights to certain portions of the "income from license agreements with Rikol, Inc. and Wellco Shoe Corporation * * *". A later agreement with Roka, Ro-Search Incorporated and The Rollmanns contains similar statements. In 1951 there was a licensing agreement with General Shoe Corporation whereby Wellco and others granted "an exclusive right and license" to make and sell footwear covered by certain patents, including the Rollmann patents. This multiplicity of transactions involving these patents subsequent to the purported absolute sale to Rikol, which subsequent transactions were in the name of the original patent owners or their representative or licensee and not in the name of Rikol, the purported absolute owner of these patents, negative the idea of such an absolute sale. The control which the owners of the Rollmann patents continued to exercise over these patents was inconsistent with the existence of an absolute sale to Rikol or to anyone else.

We find that the payments here in question were properly taxable as ordinary income, and the plaintiffs' petition is therefore dismissed.

It is so ordered.

JONES, Chief Judge, and LARAMORE, WHITAKER and LITTLETON, Judges, concur.

