RUSSELL T. WING AND ZOE E. WING, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 69094. Filed October 23, 1959.

*Hayner N. Larson, Esq.*, for the petitioners.
*Claude R. Sanders, Esq.*, for the respondent.

OPINION.

TURNER, *Judge:* The respondent determined deficiencies in income tax against the petitioners for the calendar years 1951, 1952, and 1953, and an addition to tax for the year 1951, as follows:

| Year | Deficiency | Addition to tax, sec. 294(d)(2) |
|------|-----------|----------------------------------|
| 1951 | $8,408.36 | $1,546.49 |
| 1952 | 1,214.87 | --------- |
| 1953 | 23,125.44 | --------- |

The issue raised by the pleadings is whether certain income received by petitioners with respect to certain patents is taxable as ordinary income or capital gains. A decision upon this question also decides petitioners' liability for an addition to tax for 1951, for substantial underestimation of estimated tax for that year, under section 294(d)(2) of the Internal Revenue Code of 1939.

All of the facts have been stipulated and are found as stipulated.

Petitioners are husband and wife, and residents of Excelsior, Minnesota. They filed their joint income tax returns for the calendar year 1951 with the collector of internal revenue and for the calendar years 1952 and 1953 with the district director of internal revenue for Minnesota. They kept their books and filed their returns on a cash receipts and disbursements basis.

Russell T. Wing, hereafter referred to as petitioner or Wing, invented a feed for fountain pens, in receipt of which, on June 7, 1937, he filed application (serial No. 146,846) for a United States patent.

On January 24, 1938, petitioner and the Parker Pen Company, hereafter referred to as Parker, entered into a written agreement relating to Wing's patent and improvements thereto. Under part I of the agreement, petitioner granted to Parker an "option to acquire exclusive rights and license to manufacture, use and sell fountain pens embodying" petitioner's present inventions and improvements made thereon.

Parker exercised this option granted by part I of the agreement.

Part II of the agreement, titled Exclusive License, provides in part as follows:

### II. EXCLUSIVE LICENSE

Conditioned upon Parker's election to accept the "Exclusive License" herein granted, * * * such exclusive license shall be upon the following terms, covenants and agreements, to be truly and faithfully performed:

1. Wing hereby grants and gives unto Parker subject to the terms, provisions and conditions hereinafter set forth, the exclusive right and license to make or cause to be made, to use, and to sell or cause to be sold, throughout the world, fountain pens embodying said present inventions and said improvements, under and for the life of any Letters Patent or applications for Letters Patent therefor, unless sooner terminated under the provisions hereof.

2. [Parker is obligated to pay Wing, $5,000 as an advanced payment of the entire "minimum royalty" for the first license year beginning as of the acceptance of this license.]

3. [Parker is obligated to pay an "earned royalty" of $27/100$ of 1 per cent of the invoice or sale price of each pen sold embodying any of Wing's inventions, but only that amount of the earned royalty which, if any, is in excess of the minimum royalty. For each license year after the first Parker is required to pay in advance a "minimum royalty" of $8,000.]

4. Parker shall be responsible, and assumes such responsibility, for all licensed transactions and obligations hereunder affecting the rights and/or interests of Wing, but with respect to any right or license that is herein granted to Parker, Parker is hereby authorized by Wing to exercise the same (subject always to Parker's said responsibility) by or through any other Company or agency, in this or any foreign country, that is controlled by or affiliated with Parker; and this instrument of agreement shall be binding upon and shall inure to the benefit of the successors and assigns of Parker and the heirs, legal representatives and assigns of Wing.

5. During all such time as it holds license under this agreement, Parker shall keep true records from which all royalties payable under this agreement, and the dates of accrual thereof, may readily be determined, which said records shall be open to inspection of said Wing or his accredited representatives at all reasonable times. * * *

6. Parker shall have the right to cancel this license hereunder at any time by giving Wing written notice of such cancellation ninety (90) days or more in advance thereof; and Wing shall have the right to cancel the license of Parker for any breach or default thereof by Parker, provided that Wing shall give Parker ninety (90) or more days notice in writing of his intention to cancel, specifying the cancellation date and specifying the breach or default, such

cancellation to be effective as of the date so stated, unless in the meantime Parker shall have made good its stated breach or default. * * *

*       *       *       *       *       *       *

12. During the term of its exclusive license, Parker shall have the right to bring and maintain suit under patents for said present inventions and/or improvements against infringers thereof, in its own name and/or the name of the licensor, and to make settlement with infringers; Wing to have the right to be represented, at his own separate expense, in any such proceedings by advisory counsel who shall be kept duly informed by Parker of the proceedings therein. Costs and expenses of any such suit shall be paid by Parker. In the event of any recovery and/or settlement in money and/or money-equivalent, arising from such infringement, the same shall go to Parker and Wing shall have no interest therein.

On January 16, 1940, United States Patent No. 2,187,528 was issued to the petitioner on his application of June 7, 1937.

Improvements falling under the Parker agreement were thereafter invented by petitioner, as follows:

| Applications for patents | U.S. patents issued |
|---|---|
| Oct. 3, 1941_____ Serial No. 413,440 | May 12, 1942_____ No. 2,282,840 |
| Apr. 10, 1944_____ Serial No. 530,330 | Oct. 10, 1944_____ No. 2,360,297 |
| Oct. 27, 1945_____ Serial No. 624,994 | Oct. 14, 1947_____ No. 2,428,863 |

Under date of February 26, 1943, petitioner, Parker, and W. A. Sheaffer Pen Company, hereafter referred to as Sheaffer, entered into a written agreement, which provided in part as follows:

1. WING and PARKER agree, simultaneously with the execution of this agreement, to enter into a modification of said Wing-Parker Agreement to an extent sufficient to enable PARKER to grant SHEAFFER a limited license under said Wing patents Nos. 2,187,528 and 2,282,840, and permit WING to receive royalties from SHEAFFER, all as hereinafter set forth.

2. PARKER hereby grants unto SHEAFFER, subject to the terms, provisions and conditions hereinafter set forth, the non-exclusive right and license to make or cause to be made, to use, and sell or cause to be sold, throughout the world, Fountain Pens under * * * claims * * * specified, formally and informally, as being infringed by * * * [Sheaffer's "Triumph" pen in a pending court proceeding brought by Parker and Wing against Sheaffer]. * * * [A license is also granted with respect to Sheaffer's "Triumph" pen and another pen under two design patents owned by Parker.]

3. [Parker and Wing agree not to sue Sheaffer with respect to its "Triumph" pen by virtue of any present or future patent.]

4. [Sheaffer acknowledges the validity of certain specified patents to the extent applicable to Parker's present "51" pen and agrees not to infringe them as so applicable except as allowed by the prior licensing provisions.]

5. [Sheaffer acknowledges the validity and agrees not to infringe three Parker patents relating to inks.]

6. [Sheaffer agrees not to sue Parker for infringement of any of Sheaffer's present or future patents by reason of the structure of Parker's present "51" pen.]

7. [Parker acknowledges the validity of the claims of three Sheaffer patents to the extent they are applicable to Sheaffer's present "Triumph" pen and to that extent agrees not to infringe them.]

8. [Parker further acknowledges the validity of three specific design patents owned by Sheaffer and agrees not to infringe them.]

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

10. As a part of the consideration of the license rights acquired by SHEAFFER from PARKER hereunder, SHEAFFER shall pay to PARKER within one week after the execution of this agreement by SHEAFFER the sum of Twenty-five Thousand ($25,000.00) Dollars.

11. As part of the consideration of the license hereby granted to SHEAFFER under [Wing's patents], with the consent and cooperation of [Wing, Sheaffer agrees to pay Wing an "earned royalty" of $27/100$ of 1 per cent of the invoice or sale price of each pen sold under this license, but only that part of the earned royalty which, if any, exceeds the minimum royalty provided. Sheaffer is obligated to pay in advance an annual minimum royalty of $6,000.]

12. During all such time as it holds license under this agreement, SHEAFFER shall keep true records from which all royalties payable to WING under this agreement, and the dates of accrual thereof, may readily be determined, which said records shall be open to inspection of WING or his accredited representatives at all reasonable times. &ast; &ast; &ast;

13. [Wing and Parker waive all rights to damages, profits or claims either have or may have for recovery for any past infringement by Sheaffer of the patents under which Sheaffer is licensed by virtue of this agreement.]

14. [Any reduction of the "earned royalty" or annual "minimum royalty" payable by Parker under the Parker agreement effects a like reduction under the Sheaffer agreement.]

15. With respect to cancellation or termination:

(a) [Sheaffer has the right to cancel its license under Wing's patents, at any time, by giving both Parker and Wing 90 days written notice of an intention to cancel.]

(b) WING shall have the right to cancel this license of SHEAFFER under said Wing patents for any breach or default of SHEAFFER'S obligation under paragraphs 11 and 12 thereof, provided that WING shall give SHEAFFER and PARKER ninety (90) or more days' notice in writing of his intention to cancel, specifying the cancellation date and specifying the breach or default, such cancellation to be effective as of the date so stated, unless in the meantime SHEAFFER shall make good its stated breach or default.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

(e) It is distinctly understood and agreed that any cancellation of the license to SHEAFFER under said WING [sic] patents shall not terminate, affect, modify or vary the remainder of this agreement and more particularly the terms and provisions of paragraphs 3, 4, 5, 6, 7, 8, 9, 13 and 17 hereof.

16. WING and PARKER agree to dismiss their complaint in the [pending court proceeding] without prejudice and without cost as to either party against the other.

17. This agreement and the rights hereunder granted to either PARKER or SHEAFFER shall not be assignable or transferable by PARKER or SHEAFFER or by operation of law save that they may be assigned or transferred in connection with PARKER'S or SHEAFFER'S entire Fountain Pen business and the good will therein and subject always to the conditions that the transferee thereof shall within thirty (30) days after such transfer notify, in writing, the other party or parties to this agreement, of its adoption of this agreement well and truly to be kept and performed by transferee.

This agreement, if assigned or transferred as hereinbefore provided, shall be binding upon and inure to the benefit of the successors and assigns of PARKER

and SHEAFFER, and shall also be binding upon and inure to the benefit of the heirs and legal representatives and assigns of WING.

18. [Wing agrees not to reveal to Parker or Sheaffer information contained in the reports of the other.]

In keeping with the requirements of paragraph 1 of the agreement with Sheaffer, and also under date of February 26, 1943, petitioner and Parker executed a "Rider to License Agreement," in which the parties agreed to modify the Parker agreement to the extent necessary to enable "Wing and Parker" to enter into the agreement with Sheaffer. The rider also reduced the annual advanced minimum royalties due from Parker to $6,000, so long as the Sheaffer agreement remained in effect.

Under date of March 2, 1945, petitioner, Parker, Sheaffer, and W. A. Sheaffer Pen Company of Canada, Ltd., hereafter referred to as Sheaffer of Canada, entered into a written agreement.

The Sheaffer of Canada agreement provided that all rights and license of Sheaffer to manufacture, use, or sell fountain pens in the Dominion of Canada, Newfoundland, the British Isles (including the Irish Free State), Australia, and New Zealand under the Sheaffer agreement were vested in Sheaffer of Canada. Sheaffer of Canada agreed to all of the terms and conditions of the Sheaffer agreement so far as they were applicable to the above areas, except that no annual advanced minimum royalty was payable, and the "earned royalties" due from Sheaffer of Canada were to be added to the "earned royalties" due from Sheaffer in determining the amount due from Sheaffer over and above the "advanced minimum royalty." Sheaffer guaranteed the payment of the amounts due petitioner from Sheaffer of Canada under this agreement. Under certain circumstances, this guarantee could be terminated, and in such a case, petitioner was to be permitted to terminate all rights accruing to Sheaffer of Canada under the agreement. Sheaffer was under no obligation to keep records relating to Sheaffer of Canada. Upon termination of the license portion of the Sheaffer agreement, the license under the Sheaffer of Canada agreement was also to terminate.

On February 1, 1947, petitioner, Parker, and L. E. Waterman Company, hereafter referred to as Waterman, entered into an agreement. Many of the provisions of the Waterman agreement were substantially equivalent to the provisions of the Sheaffer agreement. The Waterman agreement provided in part as follows:

1. Wing and Parker will simultaneously with the execution of this Agreement enter into a modification of said Wing-Parker Agreement to an extent sufficient to enable Parker to grant Waterman a limited license under said Wing Patents and to permit Wing to receive royalties directly, all as hereinafter set forth.

2. Parker hereby grants unto Waterman, subject to the terms, provisions and conditions hereinafter set forth, a non-exclusive right and license to make or cause to be made, to use and/or sell or cause to be sold, throughout the world,

fountain pens under said Wing Patents, but only as to and for the particular design and structure embodied in the Taperite. Unless sooner terminated as herein provided, the license above specified shall run in each country involved for the life of the longest-lived licensed patent in such country.

3. Waterman shall have the right to grant a sub-license of the same scope as that granted Waterman herein to any of its foreign manufacturing agents or foreign manufacturing subsidiaries. Waterman shall promptly notify Parker and Wing of the granting of every such sub-license.

4. Wing and Parker, respectively, will not, while Waterman is licensed under said Wing Patents sue Waterman and/or any of its agent[s] or subsidiaries in the United States or abroad, or assert against them any other patent now or hereafter owned or controlled by Wing and/or Parker, by reason of manufacture, use or sale by Waterman and/or its agents or subsidiaries of the Taperite.

\* \* \* \* \* \* \*

7. [Waterman agrees to pay Wing an "earned royalty" of $27/100$ of 1 per cent of the invoice or sale price of each "Taperite" pen sold under this license, with an annual advanced minimum royalty of $6,000. Earned royalties were to be credited against the minimum royalty to the amount of the minimum royalty provided. Agents or subsidiaries of Waterman who are sublicensed under this license shall not be liable for an annual advanced minimum royalty in any amount.]

8. [The "earned royalty" is payable by Waterman's agents and subsidiaries sublicensed under the license.]

\* \* \* \* \* \* \*

10. [Waterman and all of its agents or subsidiaries holding sublicenses are obligated to maintain true records showing the "royalties" payable to Wing and the dates of accrual thereof, all such records to be open to the inspection of Wing. Also Waterman is required to make quarterly reports to Wing and Wing covenants not to disclose to Parker, directly or indirectly, any information contained in Waterman's reports to him, nor to Waterman any information contained in Parker's reports to him.]

11. So long as Waterman's license under the Wing Patents remains in force and effect, Waterman hereby guarantees payment to Wing of the amount of the aggregate earned royalties due and payable by its manufacturing agents or manufacturing subsidiaries.

12. Wing and Parker hereby waive all rights which they, or either of them, have or may have with respect to any damages, profits or claims for recovery for any alleged past infringement by Waterman or its agents or subsidiaries, and each of them, of said Wing Patents, \* \* \*

13. [Any reduction of the "earned royalty" or annual "minimum royalty" payable by Parker under the Parker agreement effects a like reduction under the Waterman agreement.]

14. With respect to cancellation or termination:

(a) Waterman shall have the right to cancel its license and rights and the licenses and rights of its agents or subsidiaries or any of them hereunder at any time by giving both Parker and Wing written notice of such cancellation ninety (90) days or more in advance thereof;

(b) Wing shall have the right to cancel the license herein granted to Waterman for any breach or default of Waterman's or its agents' or subsidiaries' obligations under paragraphs "7" and "8" hereof, provided that Wing shall give Waterman and Parker ninety (90) or more days notice in writing of his intention to cancel, specifying the cancellation date and specifying the breach or default, such cancellation to be effective as of the date so stated, unless in

the meantime Waterman or its agents or subsidiaries or both, as the case may be, shall make good the stated breach or default;

\* \* \* \* \* \* \*

15. [The rights granted under this agreement are assignable by Waterman or its agents or subsidiaries only in connection with the transfer of the entire fountain pen business and goodwill of Waterman or its agents or subsidiaries.]

In keeping with the requirements of paragraph 1 of the agreement with Waterman, and under date of February 1, 1947, petitioner and Parker executed a "Rider to License Agreement," in which the parties agreed to modify the Parker agreement to the extent necessary to enable "Wing and Parker" to enter into the agreement with Waterman.

Petitioner has not entered into any agreements with respect to his inventions, applications for patents, and patents falling under the Parker agreement other than the said Parker agreement and its two riders, and the Sheaffer, Sheaffer of Canada, and Waterman agreements.

From time to time since execution of these several agreements, payments as required by the terms thereof have been made to petitioner by Parker, Sheaffer, Sheaffer of Canada, and Waterman. Such payments in 1951, 1952, and 1953 were as follows:

| | 1951 | 1952 | 1953 |
|---|---|---|---|
| Parker | $62,067.12 | $34,790.63 | $56,366.23 |
| Sheaffer | 20,393.34 | 19,550.04 | 23,830.21 |
| Sheaffer of Canada | 1,077.56 | 725.33 | 1,377.65 |
| Waterman | 6,000.00 | 6,000.00 | |
| Total | 89,538.02 | 61,066.00 | 81,574.09 |

Deductible from the foregoing totals under either subsection (a) or subsection (a)(1) of section 23 of the Internal Revenue Code of 1939 are the following amounts:

| | 1951 | 1952 | 1953 |
|---|---|---|---|
| Paid to investors | $12,976.44 | $16,834.93 | $8,097.00 |
| Other expenses paid | 1,488.56 | 1,950.13 | 257.50 |
| Depreciation sustained | 330.76 | 193.58 | 105.77 |
| Amortization of purchase price of investors' contracts | | 1,405.84 | 1,687.02 |
| Total | 14,795.76 | 20,384.48 | 10,147.29 |

To the extent reported by the petitioners, the remaining aggregate amounts of $74,742.26, $40,681.52, and $71,426.80 for 1951, 1952, and 1953, respectively, were reported as ordinary income in their returns for 1951 and 1952, and as long-term capital gain in their return for 1953. On March 9, 1956, the petitioners filed a claim for refund for each of the years 1951 and 1952, on the ground that such payments

so made to petitioner during those years were taxable only as long-term capital gains.

In his determination of deficiencies, the respondent has determined that the said amounts of $74,742.26, $40,681.52, and $71,426.80 are taxable as ordinary income, and not as long-term capital gains.

It is stipulated that the determination of an increase in petitioner's net long-term capital gain for 1953 of $183.65 is correct.

It is further stipulated that if the "royalties" are taxable as ordinary income, an addition to tax of $1,546.49 for 1951, under section 294(d)(2) of the 1939 Code, for substantial underestimation of estimated tax, is proper.

The question is whether the amounts received by petitioner during the taxable years from Parker, Sheaffer, and Waterman were amounts received in the sale or exchange of his patent rights, within the meaning of section 117, more particularly 117(q) of the Internal Revenue Code of 1939.[1]

Section 117(q), added to section 117 of the 1939 Code in 1956 and specifically made applicable to amounts received in any taxable year beginning after May 31, 1950, in respect of transfers of patent rights, is substantially the same as section 1235 of the Internal Revenue Code of 1954. Section 1235 had been enacted to conform the language of the statute to existing law as it had been interpreted and applied by "many court decisions," and had been made applicable to amounts so received in any taxable year to which the 1954 Code

---

[1] SEC. 117. CAPITAL GAINS AND LOSSES.
  (q) TRANSFER OF PATENT RIGHTS.—
    (1) GENERAL RULE.—A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—
      (A) payable periodically over a period generally coterminous with the transferee's use of the patent, or
      (B) contingent on the productivity, use, or disposition of the property transferred.
    (2) "HOLDER" DEFINED.—For purposes of this subsection, the term "holder" means—
      (A) any individual whose efforts created such property, or
      (B) any other individual who has acquired his interest in such property in exchange for consideration in money or money's worth paid to such creator prior to actual reduction to practice of the invention covered by the patent, if such individual is neither—
        (i) the employer of such creator, nor
        (ii) related to such creator (within the meaning of paragraph (3)).
    (3) EXCEPTIONS.—This subsection shall not apply to any transfer described in paragraph (1)—
      (A) by a nonresident alien individual, or
      (B) between an individual and any related person.
    For purposes of this paragraph, the term "related person" means a person, other than a brother or sister (whether of the whole or half blood), with respect to whom a loss resulting from the transfer would be disallowed under section 24(b).
    (4) APPLICABILITY.—This subsection shall apply with respect to any amount received, or payment made, pursuant to a transfer described in paragraph (1) in any taxable year beginning after May 31, 1950, regardless of the taxable year in which such transfer occurred.

applied. See S. Rept. No. 1622, 83d Cong., 2d Sess. (1954), pp. 439, 440, and S. Rept. No. 1941, 84th Cong., 2d Sess. (1956). Court decisions cited in the Senate reports are *Kronner v. United States*, (Ct. Cl.) 110 F. Supp. 730; *United States v. Carruthers*, 219 F. 2d 21; *Commissioner v. Celanese Corporation*, 140 F. 2d 339; *Commissioner v. Hopkinson*, 126 F. 2d 406; and *Edward C. Myers*, 6 T.C. 258.

As declared by section 117(q), the general rule is that a transfer of property consisting of "all substantial rights to a patent" shall be considered a sale or exchange of a capital asset held for more than 6 months, without regard to whether payments in consideration of such transfer are payable periodically over a period generally coterminous with the transferee's use of the patent, or are contingent on the productivity, use, or disposition of the property transferred.

That an unqualified grant of an exclusive license to manufacture, use, and sell the articles or devises covered by a patent, in consideration for the payment or the obligation to pay royalties, is a transfer of all substantial rights to the patent, and for capital gains purposes, is to be considered a sale or exchange under section 117, is now settled law and requires no citation. We do not understand the respondent to contend otherwise. It is also well established, we think, that reservations in the nature of conditions subsequent, such as the reservation by the grantor of the right to cancel for breach or default [2] and provisions requiring consent of the grantor to any assignment or sublicensing of the patent, are not to be regarded as sufficiently substantial to make the transfer other than a sale or exchange for the purposes of section 117. For cases on one or both points, see *Watson v. United States*, 222 F. 2d 689; *United States v. Carruthers, supra; Kronner v. United States, supra; Allen v. Werner*, 190 F. 2d 840; *Commissioner v. Celanese Corporation, supra; Carroll Pressure Roller Corporation*, 28 T.C. 1288; *Carl G. Dreymann*, 11 T.C. 153; and *Edward C. Myers, supra*.

It is the position of the respondent that Parker did not receive under the grant from Wing the right to license others under the patents, but that such right to grant further licenses was retained by and remained in Wing; that as evidenced by the subsequent grants to Sheaffer and Waterman, even though made in Parker's name, as the result of revisions or modifications of the original Wing-Parker agreement, such reserved right was substantial, and wholly inconsistent with the concept of a prior complete assignment or sale of the patents to Parker, and the grants to Sheaffer and Waterman were grants by Wing, not Parker.

---

[2] As shown by section 39.117(q)-2 of Regulations 118, rights which are not considered substantial for purposes of section 117(q) include "a reservation in the nature of a condition subsequent (such as a provision for forfeiture on account of nonperformance)."

The granting clause of the Wing-Parker agreement was in words which, if not qualified by limitations thereafter appearing in the instrument itself or by reservations which in the absence of specific words of grant are in reason to be implied, would, under the decided cases, appear to be effective as a grant by Wing to Parker of an exclusive right to make, use, and vend the articles covered by the patents. Also, such an interpretation of the words of grant would appear to be supported by the provisions of paragraph 12 of the instrument, which provided that Parker should have the right to bring and maintain suits under the patents in its own name, or jointly with Wing, and to make settlements with infringers, with Wing having only the right to be represented, at his own expense, by advisory counsel. Parker was to pay all costs and expenses of any such suit, and in the event of recovery or settlement in money or money-equivalent, the same was to go to Parker, and Wing was to have no interest therein.

Unlike the instruments involved in many of the decided cases, and wherein the right, subject to the consent of the grantor, to assign or license was granted, the Wing-Parker agreement carried no clause which granted to Parker any right to grant sublicenses other than to a company or agency controlled by or affiliated with it, and there was no provision giving to Parker the right or authority to assign or make complete disposition of the rights and interests received. In that connection, however, petitioner points to the words of the granting clause, which were that Wing did grant to Parker an "exclusive" right and license "to make or cause to be made, to use, and to sell or cause to be sold, throughout the world, fountain pens embodying said present inventions and said improvements, under and for the life" of the patents, and argues that such a grant was of itself a complete disposition of the patents by Wing to Parker, and there being no expressed reservation by Wing of a right to grant further licenses, the construction contended for by the respondent would be in contradiction of the plain meaning of the instrument.

If nothing had occurred other than the grant to Parker and Parker's performance and operations thereunder, the argument of the petitioner might be quite persuasive. Such, however, is not the case. The grants to Sheaffer and Waterman were, by their own terms, nonexclusive, and after the grants the rights of Sheaffer and Waterman under the patents appear to have been comparable, in all practical respects, to those of Parker. And if the rights so granted to Sheaffer and Waterman were acquired in some substantial part, even if not wholly, from Wing, it would follow that the grant from Wing to Parker had not been intended as and was not a transfer by Wing of all his substantial rights in the patents within the meaning of section 117(q), and the fact that there was some resulting dilution

of Parker's rights under the patents, which might be regarded as some indication that some of the rights acquired by Sheaffer and Waterman may have been or were acquired from Parker, would not be sufficient for the petitioner's case herein.

It is true that in each instance the grant in words was by Parker, and not Wing, but it is to be noted that the parties either considered it desirable or necessary, or Sheaffer and Waterman required, that simultaneously with the execution of the Sheaffer and Waterman agreements, Wing and Parker should execute a further agreement, modifying the Wing-Parker agreement "to an extent sufficient to enable Parker" to make the particular grant then under consideration. Under the Sheaffer agreement, Parker did receive from Sheaffer the sum of $25,000, and was thereafter required to pay to Wing an annual minimum royalty of only $6,000, instead of the $8,000 theretofore required. But Wing, as the result of the grant to Sheaffer, became entitled to annual minimum royalty of $12,000, namely, $6,000 from Parker and $6,000 from Sheaffer, instead of only $8,000, the amount called for in the Wing-Parker agreement. Under the Waterman agreement, Parker became entitled to no money payments whatever from Waterman, neither did Parker receive any reduction of its annual minimum royalty as it did in connection with the grant to Sheaffer, or little, if any, consideration of any other character, whereas Wing became entitled to an additional annual minimum royalty of $6,000, after which his annual minimum royalty on his patents was $18,000, as contrasted with the $8,000 to which he had been entitled when only the Parker agreement was outstanding. That this could be and in truth was substantial is indicated by the fact that in each of two of the years herein the payment Wing received from Waterman was the $6,000 annual minimum royalty, a payment which, absent the added minimum royalty provided, he could not have received, at least not in full, even though it be assumed that Parker, in the absence of competition under the Waterman grant, could and would have manufactured and sold, and would have paid an earned royalty on, an additional quantity of pens equal in number to the pens, if any, which Waterman actually manufactured and sold in those years.

In the Sheaffer and Waterman agreements the amount of the earned royalty payable to Wing was $27/100$ of 1 per cent of the invoice or sale price of each fountain pen embodying Wing's invention, which being exactly the same as was required of Parker on the pens manufactured and sold by it, could explain the fact that Sheaffer and Waterman were to account directly to Wing for such royalties, and not to Parker. But, on the other hand, it points up the fact that even though the apparent effect of the grants to Sheaffer and Waterman would be a substantial dilution of the noncompetitive

position Parker had theretofore enjoyed in respect of the Wing patents, Parker did not become entitled to any royalties from them and was not privileged to share in the royalties which they were to pay and did pay to Wing.

It is to be noted also that in both the Sheaffer and Waterman agreements the grantee was required to account to Wing, and not to Parker, for its operations. It was also provided that Wing should not reveal to Parker the information contained in the Sheaffer reports or the Waterman reports. Wing, and not Parker, had the right to cancel the agreements in the event of breach or default of the grantee's obligations, although it is petitioner's position herein that Parker, not he, was the grantor and that it was from Parker's rights, not his, that the grants were made. In addition, there was a specific provision in the Sheaffer agreement that the rights thereunder "granted to either Parker or Sheaffer," and, in the Waterman agreement, the rights granted to Waterman, should not be assignable or transferable by Parker or Sheaffer or Waterman, except that they might be assigned or transferred in connection with the disposition of the entire fountain pen business and goodwill of the particular party.

However much the Wing-Parker agreement, standing alone, may by its wording appear to give support to the contentions of the petitioner that he thereby granted and transferred to Parker substantially all of his rights to his patents, we agree with the respondent that the grants to Sheaffer and Waterman, whereunder and whereby substantial new and added consideration passed directly to petitioner, are wholly inconsistent with the concept of a prior disposition by him and the acquisition by Parker of all his substantial rights under and to his patents.[3]

Although there are factual differences, this case, as we see it, is in principle substantially similar to *Leubsdorf* v. *United States*, 164 F. Supp. 234, in the Court of Claims. In that case, there was an original grant by the owners of patents which according to the court's view purported to be an absolute sale of all rights and interest in the patents. But, as in this case, the parties thereafter took steps and dealt with the patents in a manner which was inconsistent with such an interpretation and concept of the original agreement. The court was of the opinion that the owners of the patents "did not

[3] For cases wherein the acts of the parties while engaged in performance under a contract where taken into account in construing the contract and regarded as being persuasive of its proper interpretation, see *Smythe* v. *Board of Commissioners*, 80 F. Supp. 138, affd. 187 F. 2d 11; *Continental Assurance Co.* v. *Conroy*, 209 F. 2d 539; *Pacific Portland Cement Co.* v. *Food Machinery & Chemical Corporation*, 178 F. 2d 541; *Matanuska Valley Farmers Cooperative Association* v. *Monoghan*, 188 F. 2d 906; *Wack* v. *Wack*, 74 N.Y.S. 2d 435; *Mt. Pleasant* v. *Michigan Consolidated Gas Co.*, 39 N.W. 2d 49; *Markides* v. *Soffer*, 93 A. 2d 99; *Fidelity-Phenix Fire Insurance Co.* v. *Jackson*, 181 S.W. 2d 625; and *Harding & Co., Inc.* v. *Einco Corporation*, 266 P. 2d 494.

effectively transfer to any other party or parties all of their substantial rights in these patents so as to constitute a sale of a capital asset thereby making the payments here in issue taxable as long-term capital gains." [4] See also *Joe L. Schmitt, Jr.*, 30 T.C. 322.

In the *Leubsdorf* case, it is true that the subsequent licensing agreements were in the name of the original patent owners, whereas in the instant case the grants to Sheaffer and Waterman were in the name of Parker. Noting as we have above, however, that the parties, as a prerequisite to such grants by Parker, regarded it desirable or necessary that Wing, by formal instrument, agree to modification of the Wing-Parker agreement "to enable" Parker to make the Sheaffer and Waterman grants, and noting further the substantial consideration flowing from those grants to Wing, to which he was not entitled under the grant to Parker, it is our view that those differences between this case and the *Leubsdorf* case are not distinguishing differences and that the same result is indicated and required in this case.

*Decision will be entered for the respondent.*

---

[4] Although covering companion or related patents, the original grant dealt with in *Leubsdorf* v. *United States* (164 F. Supp. 234) was also involved in *Rollman* v. *Commissioner*, 244 F. 2d 634, which reversed 25 T.C. 481. In that case, this Court was of the opinion that the original grant, by its terms, was not a grant of an exclusive right to make, use, and sell the patented articles, and accordingly was not a sale. The Court of Appeals, in reversing this Court, was of the view that, regardless of any flaws or deficiencies in phrasing, the grant was a grant of an exclusive right to make, use, and vend the articles covered by the patents and was sufficient to constitute a sale or exchange of the patents for capital gains purposes. The *Leubsdorf* case related to years following those involved in the *Rollman* case, and some of the events taken into account occurred after the years covered in *Rollman*. Also, it is to be noted that the decisions in the *Rollman* case, both in this Court and in the Court of Appeals, were limited to a construction of the provisions of the original agreement, and no question as to the effect of the later occurrences which the court in the *Leubsdorf* case found controlling was considered or decided. And though it did not cite or mention the *Rollman* case in this Court or in the Court of Appeals, the Court of Claims, for the purposes of its decision, accepted the proposition that the original grant, absent the subsequent inconsistent acts of the parties, could have been an effective sale of the patents for capital gains purposes.